**AMERICAN SMELTING AND REFINING COMPANY—CONSOLIDATED**

v.

**The UNITED STATES.**

No. 443-65.

United States Court of Claims.
March 20, 1970.

278

Fred W. Peel, Washington, D. C., for plaintiff, Clarence T. Kipps, Jr. and Miller & Chevalier, Washington, D. C., of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant, Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on April 24, 1969. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by defendant. Plaintiff urged adoption of the opinion, findings and recommended conclusion of law. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion, findings and recommended conclusion of law of the commissioner, with slight additions by the court, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff in accordance with the opinion with the amount of recovery to be determined pursuant to Rule 131(c).

Commissioner Fletcher's opinion, with slight additions by the court, is as follows:

This is an action to recover Federal income taxes paid by plaintiff for the calendar year 1959. The issues presented involve the deductibility and the proper method of computation of a loss claimed under section 165 of the Internal Revenue Code of 1954.[1] The facts are set forth at length in the findings below, and here they will be summarized only to the extent necessary to explain the basis for the conclusion reached that plaintiff is entitled to recover.

American Smelting and Refining Company—Consolidated (hereinafter referred to either as "ASARCO" or "plaintiff") is a New Jersey corporation whose principal business is exploring for and mining, smelting, refining and selling copper, silver, lead, zinc and other minerals. ASARCO and its affiliated companies filed a consolidated Federal income tax return on the accrual basis for the calendar year 1959 and timely paid the tax shown thereon. Thereafter, the Commissioner of Internal Revenue assessed a deficiency against plaintiff for 1959, which deficiency plaintiff paid on or about December 2, 1964. ASARCO timely filed a claim for refund in the amount of $680,513.67 for 1959 and asserted therein that the Commissioner of Internal Revenue erroneously disallowed, among other things, a loss deduction in the amount of $843,459.72. Upon the subsequent disallowance of plaintiff's refund claim, timely suit was brought in this court.[2]

Prior to 1957, ASARCO had located a porphyry copper deposit in an area known as the Mission Mine, which lay south of what later became known as Tracts 1, 2, and 3 of the San Xavier Indian Reservation (hereinafter also referred to as the "Indian lands") located near Tucson, Arizona. ASARCO's exploration activities conducted in the Mission Mine area suggested a pattern of mineralization extending from the Mission Mine northerly and northwesterly into the Indian lands. Furthermore, several mineral outcrops were observed on particular areas of the lands.

In April 1957, the United States Department of the Interior, Papago Indian Agency, publicly solicited bids for the competitive sale of exclusive prospecting permits with options to lease lands designated in 142 individually owned allotments and 160 acres of tribal land locat-

---

1. All citations to Code sections hereinafter are to the Internal Revenue Code of 1954.

2. Percentage depletion and legal expense deduction issues have been settled administratively. During this proceeding, defendant has increased the amount of the disallowed loss deduction to $888,583.60 and has reduced the amount refunded to plaintiff under the depletion issue settlement by the resulting increase in tax and interest.

ed in San Xavier Indian Reservation in Pima County, Arizona.[3] For purposes of bidding and leasing, the Department of the Interior divided these Indian lands into three tracts as mentioned above. The lands described as Tracts 1, 2, and 3 by trust patent had been allotted by the United States to individual Indians under the General Allotment Act of February 8, 1887, 24 Stat. 388 (25 U.S.C. § 331, et seq.). Under 25 U.S.C. § 396, the allottee (or his devisees or heirs) could lease the land designated in his allotment for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior. Each of the three contiguous tracts was composed of eight sections of land, was generally rectangular in shape, and contained approximately 5,120 acres. The lands in Tracts 1, 2, and 3 were a small part of an area covered by a preliminary reconnaissance-type air magnetic survey made by plaintiff prior to 1957, no part of the cost of which is involved in this suit.

The Department of Interior's Notice of Competitive Sale provided, in pertinent part:

> Each permit grants an exclusive right to prospect for minerals other than oil and gas, with an option to lease. * * * Each tract will be bid on separately, and a separate permit will be drawn for each tract * * * The allotted tracts are offered subject to the approval of the individual Indian owners. The tribal tract is offered subject to the approval of the tribal council.
>
> *   *   *   *   *   *
>
> The successful bidder is required to obtain the signature of the Indian permitters. Acreage for which signatures cannot be obtained is excluded from the permit and the bonus bid reduced proportionately. If after showing the exercise of reasonable dili-

gence and that he is unable to obtain the signatures of the landowners for at least 80 percent of one block of 2,560 acres lying anywhere within the tract, the successful bidder may withdraw his bid and recover any moneys paid to the superintendent incident to the bid except the bidder's proportionate share of the cost of advertising. The superintendent shall hold in a special fund any bonus paid by the successful bidder. Should the superintendent determine that the required signatures have been obtained, he shall within 30 days after return of the executed permit deposit to the credit of the signing landowner the bonus that remains in a proportion that the acreage they have signed for bears to the whole acreage signed for within the tract.

*   *   *   *   *   *

ASARCO was the successful bidder for Tracts 1, 2, and 3, and paid bonuses of $283,000 (which amounted to $55.27 per acre), $757,022.04 (which amounted to $146.05 per acre), and $26,005 (which amounted to $5.08 per acre), respectively, for prospecting and lease option rights in each tract. Pursuant to the requirement of the Notice of Competitive Sale, plaintiff obtained the requisite signatures of all the individual Indian allottees on prospecting permits. At the time ASARCO submitted its bids, it believed that the right to prospect the acreage in the three tracts had no value apart from the right to lease acreage within the tracts.

By the three prospecting and option contracts that were executed, the Indian landowners [4] authorized the Commissioner of Indian Affairs, or his authorized representative, to sign, execute, and deliver on their behalf mining leases. ASARCO could lease all or any part of the lands designated in an individual allotment. Under the terms of each of the contracts, however, ASARCO could exer-

---

3. Hereinafter, for convenience, the Indian lands are sometimes referred to as comprising 143 individual allotments.

4. Under the terms of the contracts, the allottees and the devisees and heirs of deceased allottees were designated as the Indian landowners.

cise its option to take preference mineral leases on not more than 2,560 acres in each tract plus such additional acreage as the Secretary of the Interior determined to be fringe acreage necessary for a successful mining operation. Plaintiff could exercise its options without additional payment for the acreage leased.

The bonus payments made by ASARCO were paid to the Bureau of Indian Affairs and delivered to the Superintendent of the Papago Agency at Sells, Arizona. In accordance with the Notice of Competitive Sale and applicable regulations, the bonuses were deposited and credited to the individual Indian money accounts (hereinafter referred to as "IIM accounts") of the Indian allottees in proportion to the acreage owned by each allottee in Tracts 1, 2, and 3, at the rates of $55.27, $146.05, and $5.08 per acre, respectively.

ASARCO mapped and surveyed the surface of all the lands in the three tracts at the same time in an operation administered as one project, laying out a grid pattern extending across all three tracts without breaks at the boundaries between the tracts. ASARCO also conducted gravity surveys, ground magnetic surveys, and electromagnetic surveys on various portions of the tracts. Relying in part on the surveys which had been performed, ASARCO formulated its drill hole pattern and proceeded to begin drilling on September 14, 1957. The rock samples gathered from some of the initial drill holes indicated the presence of ore bodies, while the results of other test drillings eliminated certain areas from consideration. Although every hole drilled by ASARCO in the course of its exploration activities conducted on the Indian lands provided meaningful geological data and information, only a portion of the holes drilled provided information relevant to the ore bodies on the lands subsequently leased.

Eight areas of interest were located on the acreage contained in the three tracts. Four of these areas of interest were located by ASARCO prior to the

placing of its bids in 1957. The remaining four were identified from geophysical data derived from the exploration work carried out in 1957. Of the eight areas of interest, all but two were eliminated by drilling. Of the six areas thus eliminated by drilling exploration, four areas had been identified initially through geophysical data and were located on acreage in which ASARCO subsequently relinquished its interests in 1959. The two ore deposits that were found on the acreage leased by plaintiff were in vicinities where, prior to any exploration in 1957–1959, plaintiff had already decided to do exploratory drilling, and these deposits were located by early drill holes in September and October 1957. The lateral extent of each of the two ore deposits on the acreage subsequently leased by ASARCO was delineated by drill holes on such acreage only. The data derived from drilling on the lands in which ASARCO subsequently relinquished its interests, in combination with the geophysical surveys previously performed, indicated that such lands did not warrant further exploration or leasing.

In 1959, ASARCO exercised its option rights under its contracts and leased 560 acres of the lands designated in Tract 1 and 1,994.37 acres of the lands designated in Tract 2. Thereafter, all payments under the leases were made to the Superintendent, Papago Agency, for credit to the Individual Indian Money (IIM) account of each Indian whose allotment covered acreage leased. ASARCO chose not to take any mineral lease in the lands designated in Tract 3. By exercising its options to lease, ASARCO retained its mineral rights in lands designated in 19 complete allotments, portions of five allotments, and the 160 acres of tribal land. At the same time, plaintiff relinquished all its right, title, and interest in acreage comprising 118 complete allotments, and portions of five allotments.

ASARCO expended $1,658,532.01 with respect to the lands in the three tracts prior to taking mining leases on 2,554.37

acres and relinquishing its rights in the remaining lands. ASARCO allocated $743,766.60 of the total bonuses it paid to the acreage in which it relinquished its interests in 1959, by multiplying the acreage not leased in each of the three tracts by a per acre bonus payment for the prospecting and option rights on the lands in each of those tracts. Plaintiff allocated $24,212.03 of the costs it incurred to acquire prospecting permits and option rights (other than bonuses paid) to the acreage in which it relinquished its interest in 1959, also on a proportionate acreage basis within a given tract. With regard to exploration costs, plaintiff allocated $29,927.64 of the costs it incurred for surveying and mapping, $31,652.85 of the costs it incurred for geophysical examinations, $42,726.70 of the costs it incurred for direct drilling, and $16,297.78 of the costs it incurred for indirect drilling, all to the acreage in which it relinquished its interest in 1959. The allocation of the costs for surveying, mapping, and geophysical examination was, again, on a proportionate acreage basis within each tract, while direct drilling costs were allocated on the basis of whether or not holes were drilled on land later leased, and indirect drilling costs were allocated in the same ratio as direct drilling expense.

The part of the bonuses it paid which plaintiff allocated to acreage not leased in those allotments where only a portion thereof was leased amounted to $32,229.-11. Consistent with the methods of computation discussed above, plaintiff allocated $5,625.87 of direct drilling expense, $2,206.88 of indirect drilling expense, and $3,020.09 of the other costs, to the acreage not leased in such so-called "split-allotments."

ASARCO deducted $888,583.60, that portion of its total expenditures regard-ing the three tracts which it had allocated to the lands in which it relinquished all its interest, as a loss in 1959 under section 165 of the Code. The Commissioner of Internal Revenue disallowed $843,459.72 of the aforesaid loss deduction, and defendant has, by offset, increased to $888,583.60 the amount of the deduction so disallowed.

### The Separate Property Issue

The threshold issue in this suit requires a determination of the nature of the property interests acquired by ASARCO in the three tracts under the prospecting and lease option permits it received as high bidder in 1957. ASARCO contends that the land in each of the 143 allotments contained in the three tracts was a separate property, and that, accordingly, plaintiff's interest in each allotment constituted a separate property interest. Thus, plaintiff continues, it is entitled to deduct as a loss under section 165 that portion of the bonus payments properly allocable to the individual properties in which it relinquished its rights in 1959. The Government responds that the bonus payments incurred by ASARCO constituted a single investment in the three tracts,[5] which investment continued to have value after ASARCO leased portions of the tracts in 1959.[6] Consequently, it is defendant's position that ASARCO did not sustain a tax-recognizable loss in 1959. In my opinion, the Government's position is not well taken.

There can be little doubt that the acreage in each allotment constituted separate property individually owned by a particular Indian allottee, his devisee or heir. In Barclay v. United States, 333 F.2d 847, 166 Ct.Cl. 421, (1964), this court was called upon to define the nature of the interests held by individual Indian allottees in allotted land. Tim-

5. Although defendant's theory is that ASARCO made a single investment in the Indian lands which constituted one property, defendant does suggest in summary that, alternatively, the Indian lands constituted three properties at most.

6. At the same time, of course, ASARCO relinquished its rights in the unleased portions of the tracts.

ber, growing on both allotted and unallotted Indian lands, was advertised for sale by the Indian Service under Interior Department regulations. The taxpayers, being the highest bidders, were awarded a sales contract for such timber, which contract was later transferred to a corporation organized by them for the purpose of milling and selling the timber. One issue resulting from this transaction was whether the taxpayers' holding period of their right to cut timber on allotted lands began to run when the Secretary of the Interior approved the sales contract or whether the period ran only from the time the separate contracts covering the individual allotted lands were signed. The court held that the timber from the *allotted* Indian land was not effectively sold to the taxpayers until the sales contracts had been executed with the consent of the individual Indian allottees. In discussing the status of timber on allotted land, the court emphasized the ultimate ownership rights possessed by individual Indian allottees, stating 333 F.2d at pages 859–860, 166 Ct.Cl. at pages 441–443:

* * * We see, therefore, that the Secretary had no statutory authority to sell the timber that stood on allotments; his office was merely to approve or disapprove of such sales as the allottees might make. *Only the allottee could transfer the ownership of the timber on his land.*

* * * * * *
* * * Nevertheless, if the Government had no right to dispose of the allotted timber—indeed was statutorily prohibited from disposing of it—then its acts were of no effect until the various allottees agreed to sell it. * * *

* * * * * *
* * * The fact remains, however, that any allottee could have refused to make such a contract, and if this had been done, plaintiffs could not have become the owners of or disposed of the timber of any dissident Indian.

The fact that the Indian's refusal to sell his timber would have amounted to an act of commercial insanity does not alter the picture; *his agreement remained a prerequisite to any ownership vesting in plaintiffs.* (Emphasis supplied.)

More recently, in Poafpybitty v. Skelly Oil Company, 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968), the question presented was whether petitioners, who were Comanche Indians, had standing to sue under an oil and gas lease approved by the Department of the Interior for use on land held by such Indians under trust patents issued by the United States, as here, under the General Allotment Act of 1887, *supra.* The Supreme Court held that the Indian lessors, as owners of the allotted lands, had the capacity to maintain an action seeking damages for an alleged breach of an oil and gas lease thereon. The Court described the Indians' rights in allotted land under the 1887 Act, as follows:

* * * [T]he allotment system was created with the Indians receiving *ownership rights in the land* while the United States retained the power to scrutinize the various transactions by which the Indian might be separated from that property. At 369, 88 S.Ct. at 984.

* * * * * *

[T]he federal restrictions preventing the Indian from selling or leasing his allotted land without the consent of a governmental official do not prevent *the Indian landowner, like other property owners, from maintaining suits appropriate to the protection of his rights.* * * * Although the approval of the Secretary is required, *he is not the lessor* and he cannot grant the lease on his own authority. At 372, 88 S.Ct. at 985. (Emphasis supplied.)

The Government has no quarrel with these decisions. It contends, however, that they have no relevance to the central issue here which, in the Government's view, turns not on the basis of

Indian ownership rights in the allotted lands, but rather on the nature of ASARCO's investment in those lands. The Government correctly points out that the Indian Bureau, for purposes of advertising, bidding, and leasing, divided the lands into three tracts; that ASARCO bid one sum for the prospecting and lease option rights offered in each tract; that, while required to obtain the consents and signatures of all the individual Indian allottees, ASARCO did not directly negotiate with the Indians regarding the terms of the contract covering each tract; and finally that the exploration of the three tracts was conducted by ASARCO as a single venture. Defendant incorrectly concludes, however, that such activities, in some talismanic way, transformed 143 individually owned separate property interests in the hands of Indian allottees into one property interest (or at most into three property interests) in the hands of ASARCO.

The procedures utilized by the Indian Bureau can only be described as administrative in function. Having no proprietary interest, the Bureau clearly was not empowered to alter or merge the separate property interests of the Indian landowners into one property. Nor did the Indians merge their separate allotments into one, or even three properties. The record clearly shows that, with the Bureau's cooperation, plaintiff took all the necessary action to ascertain the names and locations of the numerous Indian allottees, and consulted with each owner individually for the purpose of persuading each to sign the contract covering his land. ASARCO's acquisition of prospecting and lease option rights in a particular allotment was entirely dependent upon ASARCO's success in obtaining the written consent of the pertinent Indian landowner. Any such landowner was free to withhold his consent in which event, of course, no portion of the bonuses paid in respect to lands of consenting owners would be credited to the withholding owner's account. Upon the exercise of ASARCO's option to lease, moreover, only those Indian landowners whose individual allotments were actually leased became entitled to receive, in addition to the prior bonus payments, rent and royalty payments. It is clear that the integrity of each Indian allottee's ownership rights in his respective allotment was maintained at all times and provided the basis upon which plaintiff acquired a separate property interest in each of the several allotments comprising the three tracts.

In further support of its position, ASARCO justifiably points to pertinent provisions of the Treasury Regulations which deal with the question of what constitutes a separate interest in property. Treas.Reg. § 1.614–1(a) (1954) provides in pertinent part:

(1) *For purposes of subtitle A of the Code,* in the case of mines, wells, and other natural deposits, the term "property" means each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land.

(2) The term "interest" means an economic interest in a mineral deposit.

\* \* \*

(3) The term "tract or parcel of land" is merely descriptive of the physical scope of the land to which the taxpayer's interest relates. It is not descriptive of the nature of his rights or interests in the land. All contiguous areas (even though separately described) included in a single conveyance or grant or in separate conveyances or grants at the same time from the same owner constitute a single separate tract or parcel of land. *Areas included in separate conveyances or grants* (whether or not at the same time) *from separate owners are separate tracts or parcels of land even though the areas described may be contiguous.* (Emphasis supplied.)

■ This regulation, *by its own terms,* is applicable to all provisions under subtitle A of the Internal Revenue Code which encompasses all the income

tax provisions therein, including section 165. Defendant's contention that the property concept embodied in the regulation is restricted to the computation of the depletion allowance is not only contrary to the regulation's language but is also inconsistent with the legislative history of section 614 of the Code. The House Bill containing section 614 originally provided that a taxpayer could elect to aggregate two or more separate operating mineral interests owned by him, and treat such aggregation as one property only for the purpose of computing the percentage depletion allowance. The Senate Finance Committee amended this provision by making such election to aggregate effective for all income tax purposes. In explaining the change, the Finance Committee stated:

> * * * The effect of this amendment is to make the definition of property consistent so as to be applicable to the computation of both cost and percentage depletion, and to the computation of gain or loss upon a sale or exchange. S.Rep. No. 1622, 83d Cong., 2d Sess., 334 (1954).[7] U.S. Code Cong. & Admin.News, p. 4974.

In any event, the Government argues, ASARCO did not acquire 143 separate property interests in the Indian lands because Treas.Reg. § 1.614–1(a) (3), *supra*, requires the execution by separate owners of "separate conveyances or grants," whereas here the Indians signed three prospecting contracts by affixing their individual signatures thereto. Such a literal application of the regulation's words, however, seems unduly to exalt form over reality. The obvious thrust of the regulation is that for various mineral interests to be considered separate property interests, they must have been acquired from separate owners. In speaking of "separate conveyances," the regulation merely recognizes the fact that, in an ordinary business acquisition from "separate owners," the transaction would usually be accomplished by "separate conveyances." When read in context with the immediately preceding sentence in the regulation, it is clear that the separate tract definition is pitched on the question of whether one owner or several owners are involved in the particular transaction, rather than upon the employment of a given conveyancing technique.

■ At the risk of repetition, it must be reemphasized that the many Indian allottees were the separate owners of their individual allotments. As separate owners, they signed prospecting and lease option contracts granting to ASARCO certain identical rights in their respective lands. That for purposes of convenience, the signatures of the owners were affixed to three documents, rather than to 143 separate documents, is surely irrelevant to the issue involved. The reality remains that ASARCO acquired rights in 143 separate properties from the separate owners thereof, and ASARCO's rights in each allotment constituted a separate property interest. Consequently, under section 165 plaintiff sustained a tax-recognizable loss with respect to those properties in which it relinquished its interests during 1959.

### The Bonus Allocation Issue

ASARCO paid bonuses totaling $1,066,007.04, and related costs totaling $28,993.12, for the prospecting and lease option rights it acquired in the Indian lands. On its tax return for 1959, the

---

7. For further evidence that the property concept under discussion is not restricted to the depletion allowance computation see, also, Treas.Reg. § 1.614–6(d) (1954) governing the allowance of abandonment and casualty losses on aggregated mineral properties. In cases where mineral interests have been aggregated or combined into one property, this regulation prohibits the allowance of abandonment losses until such time as the entire combined property is abandoned. From this rule, the inference is permissible that loss on a separate property, not aggregated with others, should be allowed on abandonment of that separate property. The parties have stipulated in this case that ASARCO did not elect to aggregate any of the properties on the San Xavier reservation.

amounts included by ASARCO in its loss deduction for such bonuses and related costs of acquiring the property interests relinquished in 1959 were $743,766.60 and $24,212.03, respectively. Each of these amounts was determined by taking the total outlay for each tract and dividing it by the number of acres in the tract to obtain a per acre rate. The number of acres not leased in each tract was then multiplied by such per acre rate.

The Government asserts, however, that even accepting plaintiff's concept of separate property interests, its bonus payments and related costs must be allocated to the maximum acreage which it had the right to lease and not to the total acreage from which it could select. Under the Government's construction of the prospecting contracts, ASARCO's right to lease was restricted to 2,560 acres per tract, being one-half the total acreage therein. From this starting point, the Government computes the percentage of land actually leased by ASARCO to that which it had the right to lease at 22.09 percent for Tract 1, 78.-12 percent for Tract 2, and zero percent for Tract 3. By applying those percentages to the bonus payments and related costs, the Government concludes that, in no event, could ASARCO's loss exceed $343,500, as opposed to the claimed loss of $767,978. In my judgment, this conclusion cannot be accepted because, as will be seen, it leads to a distortion of well established concepts used in the computation of tax basis.

Section 165(a) states the general rule regarding losses that "there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(b) provides that the amount of the deduction shall be the adjusted basis of the property, such basis being defined by sections 1011–1012 as the cost of the property. As shown above, ASARCO acquired a separate property interest in each of the 143 separate properties comprising the Indian lands. It thereby acquired a basis in each property measured by such property's cost, which was necessarily the sum paid by ASARCO for credit to the particular Indian landowner.

The defendant objects that the Indian Bureau's uniform per acre bonus rate should not be the measure of ASARCO's cost basis because it does not accurately reflect the actual land values involved. It is apparent, the argument goes, that had ASARCO negotiated the amount of bonus directly with each individual landowner, it would have paid more for option rights in some areas than in others. This assertion is based upon an acknowledgment by ASARCO's officials that there were "areas of interest" within the reservation which showed more mineral promise than other areas therein. This type of speculation has no place in arriving at the basis of property under section 1012 of the Code. It is true that the Indian Bureau, acting for the benefit of the Indians, was responsible for the formula by which bonus payments were credited at a uniform per acre rate to the IIM accounts of the landowners in each tract. This formula was acknowledged, however, in the bid notice [8] and was agreed to by the landowners themselves. ASARCO's use of it in computing basis was entirely proper.

The fact that ASARCO's basis in each allotment must be the price paid by it for the credit of the particular Indian landowner is not affected by the acreage limitation provision contained in the contracts. Contrary to defendant's con-

---

8. The bid notice states in this respect: "* * * Acreage for which signatures cannot be obtained is excluded from the permit and the bonus bid reduced proportionately. * * * Should the Superintendent determine that the required signatures have been obtained, he shall within 30 days after return of the executed permit deposit to the credit of the signing landowner the bonus that remains in a proportion that the acreage they have signed for bears to the whole acreage signed for within the tract."

tention, that provision did not limit plaintiff's lease option rights to no more than 2,560 acres in each tract. Rather, the limitation for each tract was 2,560 acres, *plus* such additional acreage as the Secretary of the Interior might determine to be fringe acreage necessary for a successful mining operation. Clearly, by virtue of the discretion exercisable by the Secretary, there was no way to foretell at the time ASARCO's bids were accepted precisely what number of acres in each tract ASARCO might become entitled to lease.

In further support of its method of allocation, the Government urges that, since not more than one-half of the acreage in each tract could be leased, ASARCO's formula has the illogical result of automatically creating a loss of at least 50 percent of its bonus payments when its bids were submitted. Despite the first-blush appeal of defendant's argument, it cannot withstand meaningful analysis. As noted above, there was really no way in which the restrictive effect of the acreage limitation provision could have been accurately determined at the time ASARCO acquired its rights in the Indian lands. More important, however, is the fact that the likelihood of a substantial loss deduction resulting from ASARCO's activities is neither unusual in itself, nor dependent upon the construction of the limitation provision. The record contains uncontroverted testimony to the effect that ASARCO did not expect to retain, nor did it in fact retain, anywhere near 50 percent of the acreage which it explored.[9] Thus, by the very nature of its prospecting procedures, and wholly apart from any acreage lease limitation, ASARCO could reasonably have anticipated a loss deduction that might well exceed 50 percent of its bonus payments. *Cf.* Harlow N. Davock, 20 T.C. 1075 (1953); William F. Krahl, 9 T.C. 862 (1947).

Finally, the method of bonus allocation urged by defendant is erroneous because it contravenes fundamental principles of income tax law. Under defendant's method, ASARCO's basis in each separate property clearly would not be its cost as required by section 1012. To the contrary, adoption of the Government's theory would mean that the bonuses paid with respect to relinquished properties must be capitalized against retained properties to the end that ASARCO acquired no basis whatever in the relinquished properties and instead had an artificially constructed basis in the retained properties. The net effect is an unauthorized shift of basis from one property to another. Clearly, this would be improper. *See, for example, William F. Krahl, supra.* Consequently, the method of allocation utilized by plaintiff, whereby it acquired a basis in each separate property measured by the bonus payment received by the particular Indian landowner, was the proper method.

### The Exploration Cost Issue

ASARCO spent $79,388.83 to survey, map, and conduct a geophysical examination of the three tracts, and claimed as a deductible loss $61,580.49 of the amount expended. The allocation of the costs for these items was made by taking the total outlay for each tract and dividing it by the number of acres in the tract to obtain a per acre rate. The number of acres not leased in each tract was then multiplied by such per acre rate. In addition, ASARCO spent $481,268.65 in direct and indirect drilling activities on the three tracts, and claimed as a deductible loss $59,024.48 of this amount. The allocation of the costs for direct drilling was made on the basis of whether or not the holes were drilled on land later leased. The allocation of the costs for indirect drilling was determined by allocating that expense between lands leased and lands not leased in the same

9. As a general rule ASARCO's exploration activities do not result in a 50 percent rate of retention in the lands explored.

ratio as direct drilling expense. Plaintiff contends that the exploration costs it incurred in connection with each of the properties relinquished in 1959 were properly capitalized against each of such properties, respectively, and are deductible as part of its loss. The Government takes the position that the exploration costs incurred by ASARCO were capital outlays which are nondeductible without regard to the number of separate property interests acquired by it. Again, in my opinion, the Government's position is not well taken.

■ It is settled, and there is no dispute here, that exploration costs are capital expenditures and are not deductible as business expenses. Louisiana Land and Exploration Co., 7 T.C. 507 (1946), affirmed on other issues, 161 F.2d 842 (5th Cir., 1947). There is disagreement, however, as to the property against which plaintiff's exploration costs should be capitalized and, consequently, as to the timing of any loss deduction attributable thereto. Implicit in the position taken by defendant is that reliance upon the theory that ASARCO acquired a single property interest in the Indian lands is not necessary to a denial of a loss deduction for these costs. Instead, defendant relies upon I. T. 4006, 1950–1 C.B. 48, wherein the Internal Revenue Service ruled that, "[I]f property is *acquired or retained on the basis of data obtained from exploration,* costs of exploration attributable to that property should be capitalized as part of the cost of such property." [10] (Emphasis supplied.) Plaintiff argues that I.T. 4006 expressly allows the disputed loss deduction and, in any event, to the extent that it disallows such deduction the ruling is invalid as it unduly authorizes a shift in basis from abandoned property to retained property. It is unnecessary to discuss plaintiff's argument for recovery based on the invalidity of the ruling because its initial argument is dispositive. I.T. 4006 expressly allows the disputed loss deduction.

By way of elaboration upon the general rule of I.T. 4006 mentioned above, the ruling states in parts pertinent to this suit:

\* \* \* If two or more areas of interest are located or identified within the original project area, the entire cost of the reconnaissance-type survey must be allocated equally among the various areas of interest. Depending upon the final disposition of the area of interest to which it is allocated, each allocated part of the cost of the reconnaissance-type survey will be treated as a capital expenditure under section 24(a) (2) of the Internal Revenue Code or as a loss under section 23(e) or (f) of the Code. If, from the data obtained by the reconnaissance-type survey, no areas of interest are located or identified within an original project area, the entire cost of the reconnaissance-type survey may be deducted as a loss under section 23(e) or (f) of the Code for the year of abandonment of that particular project.

Where a detailed (intensive) survey is conducted with respect to a particular area of interest, if a property is acquired or retained within or adjacent to that area on the basis of the data so obtained, the entire cost of that detailed survey plus that portion of the cost of the previous reconnaissance-type survey allocated to such area must be capitalized as a part of the cost of the property so acquired or retained. Where more than one property is so acquired or retained within or adjacent to an area of interest, it is proper to allocate, on an acreage basis, the entire cost of the detailed survey plus that portion of the cost of the previous reconnaissance-type survey allocated to such area among the prop-

___

10. It should be noted that defendant's paraphrase of the Service's ruling is incomplete; the phrase critical to the relationship between the exploration activities and the property retained (as italicized above) is not mentioned.

erties so acquired or retained. * * * At 50.

The record in this suit clearly reveals that ASARCO's activities were of the type encompassed by the above-quoted language. The lands in Tracts 1, 2, and 3 were a small part of an area covered by a preliminary reconnaissance-type air magnetic survey made by plaintiff prior to 1957. As previously mentioned, eight areas of interest were located on the acreage contained in the three tracts. Four of these areas of interest were located by ASARCO prior to the placing of its bids in 1957. The remaining four were identified from geophysical data derived from the exploration work carried out in 1957. Of the eight areas of interest, all but two were eliminated by drilling. Of the six areas thus eliminated by drilling, four areas had been identified initially through geophysical data and were located on acreage in which ASARCO subsequently relinquished its interests in 1959.

The two ore deposits that were found on the acreage leased by plaintiff were in vicinities where, prior to any exploration in 1957–1959, plaintiff had already decided to do exploratory drilling, and these deposits were located by early drill holes in September and October 1957. The lateral extent of each of the two ore deposits on the acreage subsequently leased by ASARCO was delineated by drill holes on such acreage only. The data derived from drilling on the lands in which ASARCO subsequently relinquished its interests, in combination with the geophysical surveys previously performed, indicated that such lands did not warrant further exploration or leasing.

■ In short, the evidence strongly supports the conclusion that the geological and geophysical information obtained from exploration of the acreage in which ASARCO relinquished its interests in 1959 did not contribute to the discovery of ore deposits on the acreage which ASARCO actually leased, nor did such information constitute the basis upon which such acreage was leased. Consequently, the exploration costs plaintiff incurred in connection with each of the properties relinquished in 1959 were properly capitalized against each of such properties, respectively, and are deductible as a loss under the principles enunciated in I.T. 4006, *supra*.

*The Split Allotment Issue*

■ ASARCO leased only part of the lands designated in five individual allotments. The part of the bonus payments allocated by plaintiff to acreage not leased in these allotments was $32,229.-11. In addition, with respect to such unleased acreage, plaintiff incurred $5,-625.87 of direct drilling expense, and allocated $2,206.88 of indirect drilling expense and $3,020.09 of other costs. The total, $43,081.95, constituted part of the $888,583.60 loss deduction claimed by ASARCO on the theory that it is entitled to such deduction under section 165 because all its rights in specific portions of these five allotments were completely relinquished in 1959. The Government responds that ASARCO's position in this respect is completely inconsistent with its main argument that each of the 143 allotments constituted a separate property in each of which ASARCO acquired a mineral interest. Now, says the Government, ASARCO goes one step further by taking a position which, if accepted, would be tantamount to treating plaintiff's investment *in each acre* of land as a separate investment.

The Government's charge of inconsistency is not justified. There is nothing novel in ASARCO's argument that a taxpayer may realize gain or sustain loss upon a disposition of only part of his property. See, for example, Treas. Reg. § 1.61–6(a) which provides, *inter alia*:

When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts and the gain realized or loss sustained on the part of the entire property sold is

the difference between the selling price and the cost or other basis allocated to such part.

With respect to the issue under consideration, the record shows that plaintiff relinquished all its right, title, and interest in specific acreage contained in the five allotments. It has already been decided, moreover, that ASARCO's basis in each allotment is allocable to acreage therein in equal amounts. Consequently, the conclusion that ASARCO sustained a tax-recognizable loss as to the relinquished acreage in the five allotments is not inconsistent with its position that the Indian lands comprised 143 separate properties. It may be that defendant has been led to charge inconsistency because of its erroneous characterization of the transaction as merely a reduction in value of property, whereas it was, in fact, a total relinquishment of rights in property constituting a closed and completed transaction. *See*, United States v. S. S. White Dental Co., 274 U.S. 398, 401, 47 S.Ct. 598, 71 L.Ed. 1120 (1927). *Cf*. Henley v. United States, 396 F.2d 956, 184 Ct.Cl. 315 (1968).

Irrespective of whether ASARCO's investment in the relinquished acreage was lost, defendant asserts that the unrecovered cost of a partially abandoned property interest is not deductible until the rights in all of the land comprising the interest are terminated. The cases relied upon by defendant for this proposition, however, do not support it. In Oliver Iron Mining Co., 13 T.C. 416 (1949), for example, the question presented was whether the taxpayer sustained a tax-recognizable loss upon the termination of only one of several leases all acquired in one transaction at the same time for a lump sum price. The Tax Court held that the unrecovered cost of the one lease was deductible when the lease was terminated, saying at 13 T.C. 418:

> The unrecovered cost of a lease is deductible as a loss when a lease is terminated under circumstances similar to those here present, and the Commissioner has recognized this rule

by allowing a part of the loss. [Citations omitted] A lump sum purchase price should be allocated to the several leases for the purpose, inter alia, of computing loss upon termination of a lease, unless such allocation is wholly impracticable. [Citations omitted] Here, a definite part of the 1914 cost of all of the leases is easily and properly identified as a part of the cost of the Pettit lease. * * *

To the same effect, see L. B. Maytag, 32 T.C. 270, 277–278 (1959).

Defendant correctly points out that, in the case of oil and gas leases, the abandonment of a portion of the leased property, such as abandonment of an individual oil well, does not give rise to a loss deduction. *See* Witherspoon Oil Co., 34 B.T.A. 1130 (1936) and Frank Lyons, 10 T.C. 634 (1948). The rationale underlying this rule is discussed in Driscoll v. Commissioner of Internal Revenue, 147 F.2d 493 (5th Cir., 1945), wherein the issue involved was the application of the bonus restoration rule to a partially abandoned oil and gas lease. In deciding that the bonus restoration rule was applicable only upon the abandonment or termination of the entire lease, the court stated at page 495:

> Depletion of oil and gas should not be measured on the acreage basis, for it is possible for one well on a small fraction of one acre to deplete gas and oil on many surrounding acres. * * *
>
> Depletion, synthetic or real, is not measured on an acreage basis, nor can it be said that the grant of mineral rights has expired, terminated, or been abandoned so long as the privilege or lease exists and activity under such grant looking to production may reasonably be expected.

Because of the migratory characteristics of oil and gas, and the obvious impossibility of any meaningful allocation of basis between acreage retained and acreage relinquished, it is reasonable that tax consequences should await final termination of the entire property inter-

est. Until such time there is no closed and completed transaction.

The facts in this case, however, present a situation easily distinguishable from that involved in the typical oil and gas arrangement. Here, with hard minerals involved, there is no potential disparity in the relationship between a particular land surface and the subsurface minerals attributable thereto. The evidence clearly shows that a closed and completed transaction took place when ASARCO relinquished its rights in acreage having a readily allocable basis. No future benefit could be realized by ASARCO from the relinquished land or from any subsurface minerals attributable thereto. *Cf.* Henley v. United States, *supra.* Nor is there any adequate showing that at the time the bonuses were paid any particular acreage in these allotments was worth any more, or was more likely to produce minerals, than any other acreage in the same allotment. Accordingly, it is concluded that plaintiff sustained a tax-recognizable loss upon its relinquishment of all rights in parts of five individual allotments, and the amount of such loss was properly allocated and deducted by plaintiff under section 165.

On the basis of the above opinion, ASARCO is entitled to recover with the amount of recovery to be determined pursuant to Rule 131(c).