DOUGLAS A. and MARY WRIGHT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wright v. Commissioner
Docket No. 3134-77.
United States Tax Court
T.C. Memo 1980-279; 1980 Tax Ct. Memo LEXIS 305; 40 T.C.M. (CCH) 781; T.C.M. (RIA) 80279; 67 Oil & Gas Rep. 494; July 29, 1980, Filed Brian A. Steenson,Garthe Brown and Lee A. Hansen, counsel for petitioners. Jan R. Pierce, counsel for respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: [1] The respondent determined a deficiency in income tax due from the petitioners for the taxable year 1972 in the amount of $124,131. The issues remaining for decision are as follows: *307 1. The amount realized pursuant to section 1001[2] on the sale of certain oil and gas exploratory permits; 2. The proper manner of allocating losses between petitioner, Douglas A. Wright (hereinafter called "petitioner"), and other individual investors in the oil and gas exploration venture; 3.Whether petitioner was engaged in the oil and gas business during the taxable year 1973 for purposes of determining the carryback as a loss, if any, of expenses incurred by petitioner in connection with the Canadian exploratory permits. FINDINGS OF FACT Some of the facts have been stipulated.The stipulation of facts and exhibits attached thereto are incorporated by this reference. At the time the petition was filed in this case, petitioners resided in Salem, Oregon. Petitioner first became involved in the oil and gas business in 1967 when he participated in a well drilling venture in Canada. In 1968 he participated in drilling three wells in Alberta, Canada, each of which was dry. Prior to 1969 petitioner was an allied *308 member of the New York Stock Exchange. He sold his interest on the Big Board in the latter part of 1969 and became more completely involved in oil and gas exploratory operations in the Canadian Arctic. Prior to moving from his Connecticut home in November, 1972, and taking up permanent residence in Portland, Oregon, petitioner traveled extensively to Calgary, Canada, from Connecticut. He spent between a week and ten days of every month in Calgary and, in addition, he spent a substantial amount of time calling on oil companies in the United States. In 1969, petitioner was granted by the Candadian government four groups of permits (permit series numbers A4840, A5157, A5323 and A5620) which gave him the right to explore for gas and oil on 970,138 acres of land in the Canadian Arctic. Each permit was for a term of six years. Upon being issued the permits, petitioner was required to deposit with the Canadian government a sum of money, bonds or an approved demand promissory note in an amount equal to five cents per acre for the first 18 months, 15 cents per acre for the next 30 months, and 20 cents per acre for the remaining 24 months of the six-year term.To fulfill this requirement *309 petitioner made deposits in the form of approved demand promissory notes on the required dates. The deposit requirement was designed to encourage permit holders to actively explore their land. Thus, to the extent that a permit holder incurred expenses in performing exploratory work and made proof thereof to the Canadian government, the deposits would be released. In addition, a permit holder could also satisfy the work expenditure requirement by acquiring "allowable work expenditures" from permit holders in nearby areas. In other words a permit holder who failed to incur sufficient exploration expenses on his own could purchase excess allowable work expenditures of a nearby permit holder and apply the face value of the allowable work expenditure to satisfy his requirement. To carry out oil exploration and fulfill the work expenditure requirements, petitioner hired J. C. Sproule and Asociates who did exploratory work in petitioner's permit area at petitioner's expense. In addition, on one occasion in early 1973, petitioner purchased allowable work expenditures with a face value of $54,426.30 from Kenting Exploration Services, Limited, a firm that did exploration work in the *310 vicinity of the permit area covered by the A5326 permit series. Petitioner paid 50 cents on the dollar for these work expenditure credits and received, in addition, seismic and other data. Due to the magnitude of the exploratory operation conducted by petitioner, it became necessary for petitioner to seek financial backing from additional individual investors. Seventeen additional investors were ultimately brought into the venture and they contributed a total of $70,200 for a 17.58 percent interest. Petitioner treated these amounts as capital contributions rather than as the proceeds from the sale of 17.58 percent of his interest. From 1970 through 1973, petitioner, using his own funds and those obtained from the investors, expended the sums set forth below to explore the land and maintain the permits in good standing with the Canadian government: Travel and Supervision
Year
Amount
1970
$ 8,373
1971
8,578
1972
31,624
1973
18,352
$ 66,927
Exploration Costs
Permit Series
Amount
4840 Series
$12,378
5157 Series
11,597
5236 Series
45,355
5620 Series
6,390
$ 75,720
Filing Fees
Year
Amount
1970
$ 350
1971
1,600
1972
1,600
1973
1,750
$ 5,300
Interest
2,500
Total
$150,447
*311 The arrangement petitioner had with the individual investors was such that petitioner contributed all funds necessary to satisfy travel and supervision costs and the funds for the $2,500 interest payment.
On June 27, 1972, petitioner sold his right in permit series A5157 to Atlantic Richfield Canada, Ltd. (ARCO), subject to a retained five percent royalty on petroleum substances produced from the permit lands, for the following stated consideration: As full and complete payment for the interest assigned, transferred, conveyed and set over hereunder, in addition to the royalty reserved to Wright as hereinafter provided, Atlantic shall: (i) pay to Wright the sum of Five Hundred Seventy-Nine Thousand Eight Hundred and Thirty Dollars and No Cents ($579,830.00), * * * and (ii) Wright and Atlantic shall do all matters and things necessary to the end that work requirements deposits totalling Thirty-Four Thousand Seven-Hundred Eighty-Nine Dollars and Eighty Cents ($34,789.80) covering the period commencing with the 8th day of November, A.D., 1970 and ending on the 8th day of May, A.D., 1973 on the said Permits and work requirements deposits totalling thirty-Seven Thousand One-Hundred *312 Thirty-Four Dollars and Sixty Cents ($37,134.60) covering the period commencing with the 6th day of August, A.D., 1970 and ending on the 6th Day of February, A.D., 1973 on Permits numbered A4840, A4841, A4842, A4843, and A4844 be refunded to Wright and be replaced by Atlantic through payment threof [sic] to the Grantor or [sic] said Permits; and; (iii) Atlantic shall do all matters and things necessary to the end that work requirements deposits or expenditures for exploration acceptable to the Department of Indian Affairs and Northern Development totalling Twenty-Eight Thousand Seventy-Five Dollars and Sixty Cents ($28,075.60) shall be applied to Permits A4840, A4841, A4842, A4843 and A4844, as directed by Wright; and (iv) pay all costs necessary to register the transfers referred to in Clause 2(b)(iv). Subsequently, on December 4, 1972, petitioner's promissory notes dated March 31, 1971, in the amount of $34,789.80 and $37,134.60 relating to permit series A5157 and A4840, respectively, were released as a result of ARCO assuming the work requirement obligation for the former and depositing its promissory note to satisfy the deposit requirement for the latter. On February 16, 1973, when *313 additional deposits became due on permit series A4840, AROC applied work expenditures in the amount of $28,075.60 in partial satisfaction of the work expenditure requirement for the final 24-month period of the six-year term. After the assignment of permit series A5157 to ARCO, petitioner paid a total of 17.58 percent of the cash consideration to individuals who had invested in his venture and he also returned their respective share of the funds securing the promissory notes deposited with the Canadian government. At the time of the sale to ARCO, there was no trading in work expenditures, but sometime thereafter, in 1975, there was such trading. During active trading periods, prices have been know to run the gamut from almost zero on the dollar to 10, 30 and 50 cents. Usually the purchaser of work expenditures would also receive physical data; i.e., seismic data, but the value of that physical data is not clear. On March 31, 1973, petitioner's license to explore for oil and gas in Canada expired. On April 12, 1973, petitioner entered into an agreement with Imperial Oil Limited, a Canadian corporation, whereby petitioner agreed to assign an 85 percent interest in the A4840 *314 permit series to Imperial upon the condition that Imperial maintain the permits in good standing until February 9, 1981. In June of 1973, petitioner did not provide the deposit for the remaining 24 months of the six-year term of permit series A5426, and abandoned such permit series. OPINION The primary issue remaining for our consideration is the amount realized by petitioner on the sale to ARCO in 1972 of certain property rights that he owned in the Canadian Arctic. In 1969, petitioner was granted by the Canadian government four groups of permits which gave him the right to explore for gas and oil on 970,135 acres of land in the Canadian Arctic. Each permit was for a term of six years. Upon being issued the permits, petitioner was required to deposit with the Canadian government a sum of money, bonds or approved demand promissory notes in an amount equal to five cents per acre for the first 18 months, 15 cents per acre for the next 30 months and 20 cents per acre for the remaining 24 months of the six-year term. To fulfill this requirement petitioner made deposits in the form of approved demand promissory notes on the required dates. The deposit requirement was designed *315 to encourage permit holders to actively explore their land.Thus, to the extent that a permit holder incurred expenses in performing exploratory work and made proof thereof to the Canadian government, the deposits would be released. In addition, a permit holder could also satisfy the work expenditure requirement by acquiring "allowable work expenditures" from permit holders in nearby areas. In other words a permit holder who failed to incur sufficient exploration expenses on his own could purchase excess allowable work expenditures of a nearby permit holder and apply the face value of the allowable work expenditure to satisfy his requirement. On June 27, 1972, petitioner sold his rights in permit series A5157, subject to a retained five percent royalty on petroleum substances produced from the permit lands, to ARCO for $579,830 cash and the agreement on the part of ARCO to satisfy specified work expenditure requirements of petitioner totaling $100,000. Subsequently, on December 4, 1972, petitioner's promissory notes dated March 31, 1971, in the amount of $34,789.80 and $37,134.60 relating to permit series A5157 and A4840 respectively, were released as a result of ARCO assuming *316 the work requirement obligation for the former and depositing its promissory note to satisfy the deposit requirement for the latter. On February 16, 1973, ARCO applied work expenditures in the amount of $28,075.60 to permit series A4840 in partial satisfaction of the work expenditure requirement for the final 24-month period of the six-year term. Petitioner paid 17.58 percent of the cash consideration to individuals who had invested in his venture and he also returned their respective share of the funds securing the promissory notes deposited with the Canadian government. At issue is the "amount realized" under section 1001 by petitioner as a result of assigning his rights to ARCO and the dispute focuses on ARCO's agreement to satisfy $100,000 worth of petitioner's work expenditure requirements. [3]
*317 Section 1001(b) defines amount realized as the sum of money plus the fair market value of the other property received. The question to be resolved is the value to be accorded ARCO's agreement to satisfy petitioner's work expenditure requirement. Respondent takes the position that ARCO's assumption of petitioner's obligation should be valued at its $100,000 face value because petitioner was relieved of the liability to expend $100,000. Petitioner takes the position that ARCO's assumption of petitioner's obligation should be valued at the price at which petitioner could have purchased the allowable work expenditure credits on the open market, which was less than $100,000. To some extent the different approaches taken by petitioner and respondent are equally appealing. Under some circumstances petitioner would have been obligated to pay $100,000 in cash to the Canadian government; under other circumstances petitioner would have to pay for $100,000 worth of exploration expenses. In one sense, then, the amount realized by petitioner was the relief of an obligation to pay $100,000 in cash; *318 in another sense the amount realized by petitioner was the fair market value of $100,000 worth of work expenditures. Resolution of this issue turns on which of these two characterizations appears more apposite. At this juncture we note that this case does not fall within the purview of the cancellation of indebtedness doctrine despite its superficial resemblance thereto. Cancellation of indebtedness issues arise in a two-party context where the debtor is able to satisfy his obligation to the creditor by paying an amount less than the face amount of the debt. See, for example, United States v. Kirby Lumber Co.,284 U.S. 1 (1931).By contrast we are here faced with a situation where a third person has for a consideration agreed to discharge an obligation of the petitioner. Conceptually, this case stands within the constructive receipt line of cases wherein the taxpayer whose obligation has been discharged is deemed to have received income in the amount of the obligation. [4]
*319 The record shows that on June 27, 1972, the date on which ARCO's agreement must be characterized and valued, petitioner had not yet become unconditionally obligated to forfeit his deposit: petitioner still had the opportunity to satisfy the work expenditure requirement by either submitting allowable work expenditures or forfeiting his deposits. [5] On that date, then, ARCO's agreement is more properly characterized as an agreement to submit allowable work expenditure credits rather than an agreement to satisfy petitioner's obligation to expend $100,000. For purposes of this case we think it fair to say that the value of ARCO's agreement to assume petitioner's obligation is the same as the amount which petitioner would have been required to expend on that date for work expenditure credits to satisfy that obligation. We conclude that the amount realized by petitioner on June 27, 1972, was the amount which he would have been required to expend to purchase allowable work expenditure credits on that date. To complete the circle we think it necessary to *320 comment on the tax consequences of the return of the deposit. Simply stated, there are none. If a taxpayer put up a $100,000 cash deposit and then expended $100,000 on exploration, submitted the necessary documentation to the Canadian government and received back his $100,000 deposit, the return of the $100,000 deposit would not constitute income to the taxpayer. There has been no income realization event. The same holds true if the taxpayer put up a $100,000 note rather than cash as a deposit and the Canadian government returned the note after the taxpayer followed the same course of action vis-a-vis exploration. The taxpayer would not realize $100,000 cancellation of indebtedness income because there was no "indebtedness" within the meaning of that doctrine; e.g., at the time the transaction occurred the taxpayer did not have "an obligation, absolute and not contingent, to pay on demand or within a given time in cash or another medium, a fixed amount." See Treas. Reg. § 1.108(b)-1(c). Similarly, if instead of making a cash outlay for labor and exploration costs the taxpayer were to have purchased work expenditure credits, the taxpayer would not *321 have been required to recognize as gain the difference between the $100,000 and the amount expended for work expenditure credits because the return of the deposit would not be a realization event in the first place. [6] Purchasing work credits with property rather than cash as in the instant case does not change the analysis. The focus of our inquiry must shift to valuing the work expenditures. Petitioner sought to establish that the work expenditures had a very low value through the testimony of Ray Baay who was involved in the industry in the Canadian Arctic. [7] Baay asserted that there was no trading in work expenditures at the time of the instant transaction but, that sometime thereafter, there was such trading. He expressed familiarity with trades at prices from almost zero on the dollar to 10, 30 and 50 cents. One difference between the instant case and these transactions, according to Baay, was that usually the purchaser of work expenditures received physical data, i.e., seismic data. Here, petitioner received none. Indeed, the one other *322 time petitioner acquired allowable work expenditures, at a cost of 50 cents on the dollar, he also received seismic and other data. Based on Baay's testimony, petitioner asserts that the allowable work expenditure should be valued at 10 to 20 cents on the dollar. In addition, since $28,075.60 worth of the allowable work expenditures were to be applied to the final 24-month period of permit series A4840 and would not become due until June 2, 1975, petitioner contends that allowable work expenditures to be applied to that period had either no value to petitioner or no more value than 10 cents on the dollar. There are problems with petitioner's analysis. First, the trading value of work expenditures in 1975 may or may not bear any relation to the fair market value of work expenditure credits in 1972 when the instant transaction occurred. Indeed, there was a surplus of work expenditure credits in 1975 whereas none were available in 1972. This suggests that the *323 value of work expenditure credits was higher in 1972 than in 1975. Second, we are not convinced that the exploration information acquired with the purchase of allowable work expenditure credits has much value. That information relates to the seller's permit area, not the buyer's, so its value to the buyer is at best tangential. Moreover, one would expect that the seller would part with the least valuable information rather than the most valuable information. On the other hand, it is clear that the allowable work expenditure credits were not worth their face value for the simple reason that one would rather spend $100,000 for exploration rather than $100,000 for allowable work expenditure credits. The former would give the developer his allowable work expenditures plus his own original seismic and other exploration data. As in many valuation cases, the Court is not in a position to determine with any degree of exactitude the proper value of the consideration received by petitioner. Nevertheless, we must do the best we can with the meagre record before us. Using petitioner's purchase of work expenditure credits for 50 cents on the dollar in March, 1973, as the low benchmark *324 and taking into account the fact that there was no definable market in work expenditure credits in 1972, we conclude that the value of ARCO's assumption of petitioner's work expenditure obligation was $90,000. There remain two additional items that require resolution: we must determine whether petitioner was engaged in a trade or business in his Canadian venture during the year 1973; and we must determine the proper method of allocating losses incurred in this enterprise between petitioner and the investors. Our attention will be devoted to the allocation issue first. At some point petitioner brought additional investors into his operation and changed its character to that of a joint venture. Seventeen individuals contributed a total of $70,200 to acquire a 17.58 percent interest in the venture. The Internal Revenue Code treats joint ventures as partnerships for tax purposes. Section 7701(a)(2). The rules of Subchapter K of the Internal Revenue Code are thus determinative of tax treatment. Under Section 704(b) petitioner's distributive share of income and losses must be determined *325 in accord with his interest in the venture since the partnership agreement contained no provision for the special allocation of income, gain, loss, deduction or credit. Accordingly, we hold that petitioner's allocable share of partnership losses is 82.42 percent. [8]
The final issue to be resolved is whether or not petitioner's activities rise to the level of a trade or *326 business for the year 1973. Resolution of this issue determines whether petitioner may carry back to the year 1972 the losses incurred in connection with the oil and gas activity in 1973. "Trade or business" is not defined in the Internal Revenue Code or the Regulations. Whether a particular taxpayer's activities amount to carrying on a trade or business is essentially a factual determination. Higgins v. Commissioner,312 U.S. 212, 217 (1941). While various factors have been considered in making this determination, none alone is dispositive. Barrett v. Commissioner,58 T.C. 284, 288 (1972); Gentile v. Commissioner,65 T.C. 1, 4 (1975). In the instant case there is no question that petitioner carried on his activities with a profit motive in mind. There is also no question that an enterprise engaged in oil and gas exploration with a view towards development is engaged in a trade or business. The dispute turns on whether petitioner's participatory role in this venture is that of a passive investor or one who is actively engaged *327 in a trade or business. After carefully considering all the evidence, we are convinced that petitioner was actively engaged in the oil and gas business during the years 1970 through part of 1973. We note that by 1970 petitioner was no longer a newcomer to the oil and gas business. He participated in his first drilling operation in 1967, and in 1968 he was involved in three more drilling operations in Alberta. During this period he also started the Canadian Arctic project. In 1969 petitioner sold his membership in the New York Stock Exchange to devote full time to his oil and gas exploration venture. Prior to moving from Connecticut in May, 1972, and taking up permanent residence in Portland, Oregon, petitioner traveled extensively to Calgary from Connecticut. He estimated that he spent between a week and 10 days every month in Calgary and, in addition, he spent a substantial amount of time calling on oil companies in the United States. Petitioner also introduced additional investors into the operation when additional capital was needed and we think it fair to conclude that he was the individual responsible to these investors. And while petitioner subcontracted out to J.C. *328 Sproule & Associates to perform the necessary exploration work, we do not think this fact is necessarily inconsistent with the proposition that petitioner was engaging in a trade or business. Indeed, subcontracting the technical aspects of an enterprise is to be expected of a proficient businessman and does not affect his status as one who is engaged in a trade or business so long as he plays an active role in managing the enterprise. In the final analysis, the amount of time petitioner devoted to these endeavors as well as the degree to which he was concerned with the day-to-day details of the management and operation thereof, and his apparent accountability to the passive investors, all serve to convince us that petitioner's involvement in this enterprise took him far beyond the role of a mere passive investor. We conclude that petitioner was personally and actively engaged in the conduct of an oil and gas business during the years 1970 through a part of 1973. In reaching this conclusion we have not overlooked respondent's observation that all exploration costs were incurred prior to the year 1972 except for the cost of the work expenditure credits which were purchased from *329 Kenting Exploration in 1973 and respondent's assertion that the so-called travel expenses were incurred in traveling around the United States and Canada trying to sell his interest in the permits. Be that as it may, our conclusion regarding the years 1972 and 1973 is greatly influenced by the evidence which places petitioner in this trade or business in 1970 and 1971 when he was actively exploring the land. We are unwilling to conclude that his trade or business activity ended merely because in latter years his actions were directed more toward exploiting the permits through sale rather than exploration. However, we note that had petitioner not undertaken from the beginning the exploitation of the permits via exploration, we doubt that our conclusion on this point would be the same. [9]
*330 We have qualified our conclusion with respect to 1973 because there came a time in 1973 when petitioner's status changed. On March 31, 1973, petitioner's license to explore for oil and gas in Canada expired; in April, 1973, petitioner assigned permit series A4840, and in June, 1973, petitioner abandoned permit series A5326. That left certain royalty interests as petitioner's only interest in Canadian oil and gas properties. Owning royalty interests does not require participation in the active conduct of a trade or business and petitioner introduced no other evidence indicating that his active participation in a trade or business continued after that time during the year 1973. We conclude that petitioner's expenses incurred prior to the June, 1973, abandonment of the permit were section 162 expenses that can be carried back or carried forward in accord with section 172.We also conclude that expenses incurred after that date were section 212 expenses and hence are not available for carryforward or carryback. However, the parties stipulated that the expenses at issue were incurred in connection with exploiting the permits and we construe that stipulation to mean that the expenses *331 at issue were incurred prior to the time that petitioner ceased carrying on a trade or business in connection with Canadian Arctic oil and gas. To reflect the foregoing as well as concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. This case was tried before Judge William H. Quealy, who resigned from the Court on February 29, 1980. By order of the Court it was reassigned to Judge Arthur L. Nims, III↩, for disposition.
2. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue, except as otherwise expressly indicated.↩
3. Petitioner does not question that the consideration he received from ARCO in the form of ARCO's agreement to satisfy $100,000 worth of petitioner's work expenditure requirements constituted income. Respondent originally determined that the entire consideration petitioner received from ARCO constituted ordinary income, on the theory that the 5 percent royalty was a retained economic interest in the oil and gas properties. See United States v. White, 401 F.2d 610, 612 (10th Cir. 1968). Subsequently, respondent determined that its position on this issue was inconsistent with Rev. Rul. 77-187, 77-1 C.B. 50, where in a similar factual setting the Commissioner concluded that the taxpayer did not have an economic interest within the meaning of Treas. Reg. § 1.614-1(a)(1) in the mineral properties in the first place. Cf. American Smelting and Refining Co.--Consol. v. United States, 191 Ct. Cl. 307 (1970), 423 F.2d 277↩. Obviously, if that revenue ruling is correct, petitioner could not have retained an economic interest after the transfer if he did not have one prior to the transfer. In the face of this apparent inconsistency, respondent conceded the ordinary income issue.
4. This proposition was cogently illustrated by such landmark Supreme Court cases as Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929), where the employer agreed to pay taxes of the employees and United States v. Boston and Maine Railroad Co.,279 U.S. 732↩ (1929), where the lessee agreed to pay the taxes of the lessor.
5. The deadline for permit series A4840 was February 6, 1973, and the deadline for permit series A5157-A5161 was May 8, 1973.↩
6. Symmetry is maintained because the deduction (or addition to basis) would be the cost of the work credits and not the $100,000.↩
7. Petitioner did not seek to qualify Baay as an expert witness; i.e., as one who could offer an expert opinion regarding the valuation of the work expenditure credits. Rather, Baay merely testified to factual data.↩
8. On brief petitioner and respondent both contend that expenses should be allocated between the investors and petitioner in accord with the arrangement among the parties for paying expenses. Petitioner and respondent calculated these amounts differently. Respondent determined that petitioner was entitled to 53.34 percent of the losses on the ground that funds of the petitioner were used to satisfy 53.34 percent of the expenses of the enterprise.Petitioner calculated his losses by allocating to himself all so-called travel expenses, plus a portion of other costs in accord with the percentage of his funds used to satisfy these expenses. The short answer is that neither petitioner nor respondent touched base with partnership tax law in formulating their positions. The rules of partnership tax law control.↩
9. Respondent also finds support for his position in the fact that petitioner capitalized rather than deducted expenses relevant to the permits. Respondent also points to petitioner's characterization of his occupation on Schedule C of his 1973 return as "investor" in "land, oil wells, whiskey, etc." In the face of the evidence adduced in the case, we find neither point to be particularly probative.↩