POAFPYBITTY ET AL. *v.* SKELLY OIL CO.

No. 65.  Argued January 24, 1968.—Decided March 18, 1968.

366

*Charles Hill Johns* argued the cause for petitioners. With him on the briefs was *Houston Bus Hill.*

*John H. Cantrell* argued the cause for respondent. With him on the brief was *S. W. Wells.*

*Solicitor General Griswold, Acting Assistant Attorney General Williams* and *Roger P. Marquis* filed a brief for the United States, as *amicus curiae,* urging reversal.

MR. CHIEF JUSTICE WARREN delivered the opinion of of Court.

The question presented is whether petitioners, who are Comanche Indians, have standing to sue under an oil and gas lease approved by the Department of the Interior for use on land held by Indians under trust patents issued by the United States.

In 1947 the Acting Commissioner of Indian Affairs approved an oil and gas lease which petitioners had executed to respondent, Skelly Oil Company, on the form prescribed by the Department of the Interior. The first well was drilled in 1956, and seven producing wells were soon completed. In 1961 petitioners retained counsel

with the approval of the Department of the Interior [1] and brought this damage action against respondent in the District Court of Oklahoma County, Oklahoma, alleging that respondent had breached the express and implied covenants in the lease and had thereby impaired petitioners' royalties. Respondent notified the Department of the Interior and the Bureau of Indian Affairs of the litigation, but the Government made no attempt to intervene in the proceedings. The petition filed in the District Court asserted that respondent had permitted natural gas being produced from the wells to escape despite the fact that there was a pipeline less than a mile from the land. [2] Petitioners claimed that respondent ignored their request that the gas be marketed and continued to allow the gas to be wasted in violation of the terms of the lease. [3] The District Court sustained re-

---

[1] The Area Director of the Bureau of Indian Affairs approved a contract between petitioners and an attorney for legal services to be rendered in connection with this litigation. The Area Director has been delegated the authority to approve the employment of attorneys for individual Indians who may be compensated on a *quantum meruit* basis from restricted trust funds. Section 269 of Order 551 of the Commissioner of Indian Affairs, 16 Fed. Reg. 2939 (1951), as amended, 22 Fed. Reg. 6066 (1957).

[2] The petition also alleged that the waste of natural gas violated § 86.3 of the Oklahoma Oil and Gas Conservation Act. Okla. Stat. Tit. 52, § 86.3 (1951). In response to a motion to require petitioners to elect between or state separately a cause of action under the lease and one based on tort, the District Court, with the approval of the parties, struck the alleged violation of the conservation statute from the petition. After petitioners announced that the petition then stated only one cause of action which sought recovery for the breach of the lease, the District Court denied the motion.

[3] The lease provides:

"3. In consideration of the foregoing, the lessee hereby agrees:

.        .        .        .        .

"(f) Diligence, prevention of waste.—To exercise reasonable diligence in drilling and operating wells for oil and gas on the lands covered hereby, while such products can be secured in paying

spondent's demurrer and dismissed the petition. The Supreme Court of Oklahoma affirmed on the ground that petitioners were precluded from suing by the provisions of the lease and by the regulations promulgated by the Secretary of the Interior to control oil and gas leases on restricted Indian land.[4] We granted certiorari, 389 U. S. 814 (1967), to determine whether the federal restrictions imposed on the Indians prevented them from vindicating their rights. In our view, the decision below unduly restricts the right of the Indians to seek judicial relief for a claimed injury to their interests under the oil and gas lease.

The trust patents to the land in question were issued to petitioners under the General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U. S. C. §§ 331–358, which provided that individual Indians were to be allotted land on their reservations[5] and that the United States was to hold the land "in trust for the sole use and benefit of the Indian" allottees for a 25-year period. 25 U. S. C. § 348. During the trust period, which has been repeatedly extended,[6] restricted Indian land may be sold or leased only with the consent of the Secretary of the Interior. In our view, these restrictions on the Indian's control of his land are mere incidents of the promises

---

quantities; to carry on all operations hereunder in a good and workmanlike manner in accordance with approved methods and practice, having due regard for the prevention of waste of oil or gas developed on the land . . . ."
See 30 CFR §§ 221.18, 221.35 (1967).

[4] The opinion of the Oklahoma Supreme Court is not reported.

[5] Indians are expressly authorized to institute proceedings against the United States to establish their right to an allotment. 25 U. S. C. § 345.

[6] See note following 25 U. S. C. § 348. And see 25 U. S. C. § 462, which provides: "The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are extended and continued until otherwise directed by Congress."

made by the United States in various treaties to protect Indian land and have no effect on the Indian's capacity to institute the court action necessary to protect his property. In order to fulfill these national promises to safeguard Indian land and at the same time "to prepare the Indians to take their place as independent, qualified members of the modern body politic," *Board of County Comm'rs* v. *Seber,* 318 U. S. 705, 715 (1943), the allotment system was created with the Indians receiving ownership rights in the land while the United States retained the power to scrutinize the various transactions by which the Indian might be separated from that property. *Squire* v. *Capoeman,* 351 U. S. 1, 9 (1956). See, *e. g.,* 18 Cong. Rec. 190–192 (1886). This dual purpose of the allotment system would be frustrated unless both the Indian and the United States were empowered to seek judicial relief to protect the allotment. The obligation and power of the United States to institute such litigation to aid the Indian in the protection of his rights in his allotment were recognized in *United States* v. *Rickert,* 188 U. S. 432 (1903); *Heckman* v. *United States,* 224 U. S. 413 (1912); and *United States* v. *Candelaria,* 271 U. S. 432 (1926). See generally Federal Indian Law 326–341 (Dept. of Interior, 1958). In *Heckman,* an action brought by the United States to set aside an improper conveyance of restricted land, this Court realized that the allotment system created interests in both the Indian and the United States.[7] "A transfer of the allotments is not simply a violation of the proprietary rights of the Indian. It violates the governmental rights of the United States." 224 U. S., at 438.

---

[7] "This national interest is not to be expressed in terms of property, or to be limited to the assertion of rights incident to the ownership of a reversion or to the holding of a technical title in trust." *Heckman* v. *United States,* 224 U. S. 413, 437 (1912), quoted with approval in *United States* v. *Hellard,* 322 U. S. 363, 366 (1944).

In holding that the United States could sue to protect the allotment, the Court indicated that the Government could either bring the necessary suit itself or allow the litigation to be prosecuted by the Indian.

> "In what cases the United States will undertake to represent Indian owners of restricted lands in suits of this sort is left under the acts of Congress to the discretion of the Executive Department. The allottee may be permitted to bring his own action, or if so brought the United States may aid him in its conduct . . . . And when the United States itself undertakes to represent the allottees of lands under restriction and brings suit to cancel prohibited transfers, such action necessarily precludes the prosecution by the allottees of any other suit for a similar purpose relating to the same property." *Id.,* at 446.

Later decisions followed the implications of *Heckman* and held that the right of the United States to institute a suit to protect the allotment did not diminish the Indian's right to sue on his own behalf. In *Creek Nation v. United States,* 318 U. S. 629 (1943), this Court held that Indian tribes had the power to sue a railroad for the improper use of Indian land even though the tribes could not sue the United States for its failure to collect the sums allegedly due.[8] The Court stated, "That the United States also had a right to sue did not necessarily preclude the tribes from bringing their own actions." *Id.,* at 640. Accord, *Lane v. Pueblo of Santa Rosa,* 249 U. S. 110 (1919); *Skokomish Indian Tribe v. France,* 269 F. 2d 555 (C. A. 9th Cir. 1959). Nor does the existence of the Government's power to sue affect the rights

---

[8] Indians of course are now authorized to bring claims against the United States. See Indian Claims Commission Act, 60 Stat. 1049 (1946), 25 U. S. C. §§ 70–70w. For claims arising after August 13, 1946, see 28 U. S. C. § 1505, conferring jurisdiction on the Court of Claims.

of the individual Indian.[9] "A restricted Indian is not without capacity to sue or to be sued with respect to his affairs, including his restricted property. . . . Both the Act of April 12, 1926 and the decision . . . in Heckman v. United States . . . recognize capacity in a restricted Indian to sue or defend actions in his own behalf subject only to the right of the Government to intervene." *Sadler* v. *Public Nat. Bank & Trust Co.,* 172 F. 2d 870, 874 (C. A. 10th Cir. 1949). And in *Choctaw & Chickasaw Nations* v. *Seitz,* 193 F. 2d 456, 459 (C. A. 10th Cir. 1951), the court stated that *Heckman, supra, Lane, supra,* and *Candelaria, supra,* "clearly recognized the rights of restricted Indians and Indian tribes or pueblos to maintain actions with respect to their lands, although the United States would not be bound by the judgment in such an action, to which it was not a party, brought by the restricted Indian or an Indian tribe or pueblo." In *Brown* v. *Anderson,* 61 Okla. 136, 160 P. 724 (1916), the Oklahoma Supreme Court itself held that *Heckman* had "fully answered" the argument that only the United States as guardian of the Indian could bring a suit to cancel an improper conveyance of a restricted Indian allotment. The court held:

> "Osborne Anderson, the defendant in error, although a full blood Indian, was a citizen of the United States and of the state of Oklahoma. No good reason appears why he should be denied the privilege of appealing to the courts of the state the same as any other citizen to enforce his rights to property, even though such property be land upon

---

[9] "[T]he rights of restricted Indians and Indian tribes or pueblos to maintain actions with respect to their lands are clearly recognized, although the United States might not be bound by a judgment in such an action to which it was not a party." Federal Indian Law 336 (1958).

which restrictions against alienation have been imposed by an act of Congress." 61 Okla., at 138–139, 160 P., at 726.

See *Bell* v. *Fitzpatrick*, 53 Okla. 574, 157 P. 334 (1916); L. Mills, Oklahoma Indian Land Laws § 328 (1924). We agree that the federal restrictions preventing the Indian from selling or leasing his allotted land without the consent of a governmental official do not prevent the Indian landowner, like other property owners, from maintaining suits appropriate to the protection of his rights.

There remains the question whether the terms of the oil and gas lease or the regulations promulgated by the Secretary of the Interior to govern those leases prevent the Indians from seeking judicial relief for an alleged impairment of their interests under the lease. Respondent argues that the Secretary has such complete control over the lease that only he can institute the necessary court action.

The leasing of allotted land for mining purposes "by said allottee" is expressly authorized by 25 U. S. C. § 396. Although the approval of the Secretary is required, he is not the lessor and he cannot grant the lease on his own authority.[10] The Secretary is authorized to promulgate regulations controlling the operation and development of the lease and to issue necessary written instructions to the lessee. *Ibid*. See generally 25 CFR §§ 172.1–172.33 (1967); 30 CFR §§ 221.1–221.67 (1967). The lessee is required to furnish a surety bond, in an amount satisfactory to the Secretary, guaranteeing compliance with the terms of the lease, which incorporate the regulations of the Secretary. 25 U. S. C. § 396c.

---

[10] A proviso to § 396 does give the Secretary the power to offer leases on his own if the allottee is deceased and the heirs have not been determined or cannot be found. 25 U. S. C. § 396.

The Secretary has the power to inspect the leased premises and the books and records of the lessee. 25 CFR § 172.25 (1967). The Secretary also has the power to impose such restrictions as to the time for the drilling of wells or the production from any well "as in his judgment may be necessary or proper for the protection of the natural resources of the leased land and in the interests of the Indian lessor." 25 CFR § 172.24 (1967). The lessee must furnish the Secretary with a monthly report disclosing all operations conducted on the lease, 30 CFR §§ 221.60–221.65 (1967), and must pay the royalties to the Secretary who deposits them to the credit of the Indian lessor. 25 CFR §§ 172.14, 172.16 (1967). The lessee agrees to drill wells which the Secretary determines are necessary to protect the leased land from drainage by another well on adjoining property. 30 CFR § 221.21 (1967). Finally, the lessee is obligated to prevent the waste of oil and gas and agrees to pay the Indian lessor the full value of all gas wasted, unless the Secretary determines at the request of the lessee that the waste was sanctioned by state and federal law. 30 CFR §§ 221.18, 221.35 (1967).

While the United States has exercised its supervisory authority over oil and gas leases in considerable detail, we find nothing in this regulatory scheme which would preclude petitioners from seeking judicial relief for an alleged violation of the lease. If the Government does determine that there has been waste in violation of a lease, it will of course satisfy its trust obligations by filing the necessary court action. However, there is nothing in the lease or regulations requiring the Indians to seek administrative action from the Government instead of instituting legal proceedings on their own. The existence of the power of the United States to sue upon a violation of the lease no more diminishes the right of the Indian to maintain an action to protect that lease than

the general power of the United States to safeguard an allotment affected the capacity of the Indian to protect that allotment. Furthermore, the Bureau of Indian Affairs, which is the agency of the Department of the Interior charged with fulfilling the trust obligations of the United States, is faced "with an almost staggering problem in attempting to discharge its trust obligations with respect to thousands upon thousands of scattered Indian allotments. In some cases, the adequate fulfillment of trust responsibilities on these allotments would undoubtedly involve administrative costs running many times the income value of the property." H. R. Rep. No. 2503, 82d Cong., 2d Sess., 23 (1952). Recognizing these administrative burdens and realizing that the Indian's right to sue should not depend on the good judgment or zeal of a government attorney, the United States has indicated its support of petitioners' position that Indians have a capacity to sue under the oil and gas lease.[11]

The regulations do empower the Secretary to cancel a lease "for good cause upon application of the lessor or lessee, or if at any time the Secretary is satisfied that the provisions of the lease or of any regulations heretofore or hereafter prescribed have been violated." 25 CFR § 172.23 (1967). However, there is no justification for concluding that the severe sanction of cancellation of the lease is the only relief for all breaches of the lease terms or for any failure to pay royalties. Both the lessor and the lessee may wish to resolve their disagreement by the payment of damages and not by the cancellation of a basically satisfactory lease.

---

[11] The Memorandum for the United States as *amicus curiae* states, at 7:

"In sum, respondent's contention that, until the trusteeship is ended, the Indian landowners are disabled from maintaining suit for breach of a lease they have granted of their own property is unsupported in the governing statutes, the implementing regulations, or the terms of the lease."

Nor is the capacity of the Indian defeated by § 6 of the lease, which provides that the Secretary may cancel the lease "before restrictions are removed," and concludes, *"Provided,* That after restrictions are removed the lessor shall have and be entitled to any available remedy in law or equity for breach of this contract by the lessee." [12] There is no warrant for implying by negative inference from this proviso a denial of all remedies otherwise available to the Indian prior to the removal of the federal restrictions on his power to alienate the land. Section 6 merely provides that when the federal restrictions on alienation are terminated, the federal supervision over the lease will likewise come to an end, without impairing the continuing rights of the Indian. Compare 25 CFR § 172.28 (1967).[13]

Respondent's argument that the judgment in its favor should be sustained on available adequate state pro-

---

[12] Section 6 of the lease provides:

"6. Cancellation and forfeiture.—When, in the opinion of the Secretary of the Interior, there has been a violation of any of the terms and conditions of this lease before restrictions are removed, the Secretary of the Interior shall have the right at any time after 30 days notice to the lessee, specifying the terms and conditions violated, and after a hearing, if the lessee shall so request within 30 days of receipt of notice, to declare this lease null and void, and the lessor shall then be entitled and authorized to take immediate possession of the land: *Provided,* That after restrictions are removed the lessor shall have and be entitled to any available remedy in law or equity for breach of this contract by the lessee."

[13] The regulation dealing with the removal of restrictions avoids the danger of a negative inference by stating: "Oil and gas leases . . . on land from all of which restrictions against alienation have been or shall be removed, even if such leases contain provisions authorizing supervision by the Department, shall, after such removal of restrictions against alienation, be operated entirely free from such supervision, and the authority and power delegated to the Secretary of the Interior in said leases shall cease . . . ." 25 CFR § 172.28 (1967).

cedural grounds is untenable. Since the Oklahoma Supreme Court's decision rested solely on federal grounds, that court must have either rejected or failed to reach the asserted state grounds. Furthermore, we intimate no view on the merits of the case. If the lessee has conformed to all of the requirements of the federal regulations and has not breached any of the terms of the lease, the suit may fail. We merely hold that the Indian lessors have the capacity to maintain an action seeking damages for the alleged breach of the oil and gas lease. Accordingly, the judgment of the Supreme Court of Oklahoma is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Marshall took no part in the consideration or decision of this case.