**SAMEDAN OIL CORPORATION,**
Plaintiff,

v.

**COTTON PETROLEUM CORPORATION, Sun Oil Company, Oklahoma Natural Gas Corporation and the United States of America, Defendants.**

**COTTON PETROLEUM CORPORATION,**
Plaintiff,

v.

**The Honorable Cecil ANDRUS, Secretary of the Interior, Stanley Speaks, Area Director for the Bureau of Indian Affairs, Anadarko Agency, and Samedan Oil Corporation, Defendants.**

**Nos. CIV–75–0434–D and CIV–77–0415–D.**

United States District Court,
W. D. Oklahoma.

Dec. 8, 1978.

G. D. Ashabranner and Fisher Ames, Oklahoma City, Okl., for Samedan Oil Corp.

G. L. Jidge Verity, Oklahoma City, Okl., for Cotton Petroleum Corp.

William C. Phelps and Rufus N. McKnight, Jr., Dallas, Tex., for Sun Oil Co.

William Scheurich, Tulsa, Okl., for Oklahoma Natural Gas Corp.

Larry D. Patton, U. S. Atty., by John E. Green, First Asst. U. S. Atty., Oklahoma City, Okl., for the United States, Cecil Andrus and Stanley Speaks.

## MEMORANDUM OPINION

DAUGHERTY, Chief Judge.

The first of these consolidated cases, *Samedan Oil Corporation v. Cotton Petroleum Corporation,* CIV–75–0434–D (hereinafter referred to as "75–0434"), is an action to quiet title to an oil and gas lease covering certain restricted Indian land located in Canadian County, Oklahoma, which was in-

cluded in a communization agreement executed and approved by an authorized representative of the Secretary of the Interior and for an accounting and other relief. The second case *Cotton Petroleum Corporation v. Andrus,* CIV–77–0415–D (hereinafter referred to as "77–0415") is an action for judicial review of the administrative decision of the Secretary of the Interior, as entered by the Interior Board of Land Appeals (IBLA) [*Cotton Petroleum Corp. v. Samedan Oil Corp.,* 29 IBLA 13 (February 8, 1977)] affirming the approval of the communization agreement mentioned above. The Court has subject matter jurisdiction of these cases pursuant to 28 U.S.C. § 1331 and both cases have been submitted to the Court for decision upon stipulated facts, the briefs of the parties and the administrative record.

From the record before the Court, it appears that pursuant to the Act of March 3, 1891, 26 Stat. 989, 1022 (1891), certain land including the SW ¼ SW ¼ of Section 22, Township 12 North, Range 9 West, Canadian County, Oklahoma, was allotted to Without Nose, Cheyenne-Arapaho Allottee No. 1165, by a trust patent in 1892. By restrictive deed approved November 13, 1920, the SW ¼ SW ¼ of Section 22 was conveyed to Lottie Coyote Sleeper who died in 1975 and whose heirs had not been determined when 75–0434 was filed.

By Order No. 65190 dated March 3, 1967 (Exhibit B2 to Exhibit # 12),[1] and Order No. 73241 dated April 10, 1969 (Exhibit B1 to Exhibit # 12), the Oklahoma Corporation Commission established Section 22 as a drilling and spacing unit for the production of gas and gas condensate from the Skinner Sand and Morrow Sand common sources of supply. Subsequently, Sun Oil Company (Sun) acquired an oil and gas lease (hereinafter referred to as the "Sun lease") from Lottie Coyote Sleeper covering the SW ¼ SW ¼ of Section 22 for a term of five years from the date of its approval (Exhibit # 1). Said lease was approved by a representative

of the Secretary of the Interior on October 14, 1969. Sun agreed to assign the Sun lease to Cotton Petroleum Corporation (Cotton) by an agreement dated July 2, 1974, subject to certain conditions which included drilling a test well in the NW ¼ of Section 22 to a prescribed depth and within a specified time and the formation of a unit in Section 22 (Exhibit # 2).

On November 7, 1974, Cotton completed the test well within the prescribed time limit (Exhibit 3). Shortly thereafter, Cotton submitted an unsigned proposed communization agreement to the United States Geological Survey whereby the SW ¼ SW ¼ of Section 22 was to be included in the drilling unit consisting of all of Section 22 as established by the Oklahoma Corporation Commission's Orders No. 65190 and 73241. However, the Geological Survey returned the proposed communization agreement to Cotton without approval because the Sun lease had expired on October 14, 1974, and was being offered for sale on December 3, 1974 (Exhibit # 4).

At said sale, Tom R. Gray, Jr., acting on behalf of Samedan, was the successful bidder and an oil and gas mining lease covering the SW ¼ SW ¼ of Section 22 was subsequently executed (Exhibit # 6). This lease (hereinafter referred to as the "Samedan lease") was for a term of five years from the date of its approval on January 9, 1975, and was assigned to Samedan by an approved assignment dated December 13, 1974 (Exhibit # 8).

By an assignment dated December 30, 1974, Sun purported to assign the Sun lease to Cotton (Exhibit # 9). However, this assignment was never approved by the Secretary of the Interior or his authorized representative as required.

In January, 1975, Cotton instituted "force pooling" proceedings before the Oklahoma Corporation Commission (Exhibit # 10). These proceedings resulted in Order No. 111345 dated March 5, 1975, which pooled the outstanding interests underlying Sec-

1. Exhibit references are to the exhibits attached to the Stipulation filed in 75–0434–D on April 5, 1977, and incorporated into the record

in 77–0415–D by the Stipulation filed in said case on June 19, 1978.

tion 22 for the production of gas and gas condensate from the Morrow and Skinner common sources of supply, designated Cotton as the operator and fixed the cost of the well drilled thereon at $486,000.00 (Exhibit D to Exhibit # 12). Claiming ownership under the Samedan lease, Samedan elected to participate in the well drilled by Cotton in the NW ¼ of Section 22 (Exhibit E to Exhibit # 12) and tendered its proportionate part of the costs of said well. However, Cotton refused the tender and returned Samedan's check on the ground that Cotton did not recognize Samedan's ownership under the SW ¼ SW ¼ of Section 22 and therefore did not recognize Samedan's right to participate in Cotton's well in the NW ¼ of said section.

In a joint letter to Cotton and Samedan dated January 25, 1975, the Area Oil and Gas Supervisor of the United States Geological Survey requested that a communitized area consisting of all of Section 22 be formed so that the royalty owners under the Indian lands involved could share in royalties on production from Cotton's well in the NW ¼ of Section 22 (Exhibit # 1). However, Cotton replied that it did not desire to enter into a communization agreement at that time because Cotton wanted to pursue litigation regarding the validity of the Sun lease. Thereafter, without the knowledge or consent of Cotton, Samedan entered into a communization agreement dated April 21, 1975, and approved on May 20, 1975, with the Anadarko Area Director of the Bureau of Indian Affairs, acting on behalf of the estate of Lottie Coyote Sleeper, whereby the SW ¼ SW ¼ of Section 22 was included in a unit consisting of Section 22 for the production of gas and gas condensate from the Morrow and Skinner formations (Exhibit # 12).

On May 27, 1975, Samedan commenced 75–0434 seeking to quiet title to its lease against Cotton and Sun and also Oklahoma Natural Gas Company which has been buying the production from the unit since first production on January 11, 1975. Sun subsequently filed a disclaimer wherein it disclaimed all right, title and interest in and to the lease covering the SW ¼ SW ¼ of

Section 22 which it entered into with Lottie Coyote Sleeper and assigned to Cotton.

On June 9, 1975, Cotton instituted an administrative appeal to the Commissioner of Indian Affairs objecting to the Anadarko Area Director's approval of the communization agreement between Samedan and the estate of Lottie Coyote Sleeper. Proceedings in 75–0434 were stayed by this Court pending the outcome of the administrative appeal. Jurisdiction over said appeal finally vested in the IBLA and on February 8, 1977, the IBLA issued its decision affirming the decision of the Anadarko Area Director (Exhibit # 13). Thereafter, Cotton commenced 77–0415 seeking judicial review of the IBLA's decision.

As noted previously, 75–0434 and 77–0415 have been consolidated and the parties have stipulated that all matters on file in each case may be incorporated into the record in both cases. Disposition of 77–0415 in favor of the Defendant Secretary of the Interior will require a decision in favor of Samedan in 75–0434. Therefore, the Court will conduct the judicial review sought in 77–0415 before considering 75–0434.

In reviewing the decision of the Defendant Secretary of the Interior, as reached by the IBLA, the Court must determine whether, upon the entire administrative record, there is substantial evidence to support the Secretary's decision, and if so, the decision must stand. *Roberts v. Morton,* 389 F.2d 87 (D.Colo.1975), *aff'd,* 549 F.2d 158 (Tenth Cir. 1976), *cert. denied,* 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977); *see* 5 U.S.C. § 706(2)(E); *Nickol v. United States,* 501 F.2d 1389 (Tenth Cir. 1974); *Pan American Petroleum Corp. v. Udall,* 352 F.2d 32 (Tenth Cir. 1965); *Henrikson v. Udall,* 350 F.2d 949 (Ninth Cir. 1965). "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). It must be enough to justify, if the trial were

to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. *Consolo v. Federal Maritime Commission, supra; NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939). This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Illinois Central Railroad Co. v. Norfolk & Western Railway Co.,* 385 U.S. 57, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); *Consolo v. Federal Maritime Commission, supra; NLRB v. Nevada Consolidated Copper Corp.,* 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305 (1942). Furthermore, in analyzing the administrative record in this case, the Court must also be persuaded that the Secretary applied the proper legal standards and correctly interpreted any applicable rules and regulations in reaching his decision. *Roberts v. Morton, supra; see Sainberg v. Morton,* 363 F.Supp. 1259 (D.Ariz.1973); *see generally* 5 U.S.C. § 706(2).

The leasing of restricted Indian allotments for mining purposes "by said allottee" with the approval of the Secretary of the Interior is authorized by 25 U.S.C. § 396.[2] *Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968). § 396 also authorizes the Secretary to promulgate regulations controlling the operation and development of the lease. *See generally,* 25 C.F.R. §§ 172.1–172.33; 30 C.F.R. §§ 221.1–221.67. 25 U.S.C. § 396d makes all operations under any oil and gas lease issued pursuant to any act affecting restricted Indian lands subject to the rules and regulations promulgated by the Secretary. In this connection, the Secretary has promulgated 25 C.F.R. § 1.4 which limits state and local regulation of the use of Indian property and provides as follows:

"§ 1.4   State and local regulation of the use of Indian property.

(a) Except as provided in paragraph (b) of this section, none of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States.

(b) The Secretary of the Interior or his authorized representative may in specific cases or in specific geographic areas adopt or make applicable to Indian lands all or any part of such laws, ordinances, codes, resolutions, rules or other regulations referred to in paragraph (a) of this section as he shall determine to be in the best interest of the Indian owner or owners in achieving the highest and best use of such property. In determining whether, or to what extent, such laws, ordinances, codes, resolutions, rules or other regulations shall be adopted or made applicable, the Secretary or his authorized representative may consult with the Indian owner or owners and may consider the use of, and restrictions or limitations on

**2.**  25 U.S.C. § 396 provides as follows:

"All lands allotted to Indians in severalty, except allotments made to members of the Five Civilized Tribes and Osage Indians in Oklahoma, may by said allottee be leased for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior; and the Secretary of the Interior is authorized to perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section into full force and effect: *Provided,* That if the said allottee is deceased and the heirs to or devisees of any interest in the allotment have not been determined, or, if determined, some or all of them cannot be located, the Secretary of the Interior may offer for sale leases for mining purposes to the highest responsible qualified bidder, at public auction, or on sealed bids, *after notice and advertisement,* upon such terms and conditions as the Secretary of the Interior may prescribe. The Secretary of the Interior shall have the right to reject all bids whenever in his judgment the interests of the Indians will be served by so doing, and to readvertise such lease for sale."

the use of, other property in the vicinity, and such other factors as he shall deem appropriate."

25 C.F.R. § 172.24 requires lessees to carry out and observe all operation and development regulations governing oil and gas operations on restricted Indian lands and provides in part as follows:

"(b) All leases issued under the provisions of the regulations in this part shall be subject to imposition by the Secretary of such restrictions as to time or times for the drilling of wells and as to the production from any well or wells as in his judgment may be necessary or proper for the protection of the natural resources of the leased land and in the interests of the Indian lessor. In the exercise of his judgment the Secretary may take into consideration among other things the Federal laws, State laws or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production or both, and also any regulatory action desired by tribal authorities.

(c) All leases issued pursuant to the regulations in this part shall be subject to a co-operative or unit development plan affecting the leased lands if and when required by the Secretary of the Interior."

In the instant case, both the Sun lease assigned to Cotton and the Samedan lease contain provisions in paragraph 3(g) of said leases whereby the lessees expressly agreed to "abide by and conform to any and all regulations of the Secretary of the Interior now or hereafter in force relative to such leases . . . ." In paragraph 11 of said leases the parties thereto agreed to "subscribe to and abide by any agreement for the cooperative or unit development of the field or area, affecting the leased lands, or any pool thereof, if and when collectively adopted by a majority operating interest therein and approved by the Secretary of the Interior, during the period of supervision."

■■ In view of the foregoing, it is apparent that the SW ¼ SW ¼ of Section 22 could not be included in the drilling and spacing unit created by the Oklahoma Corporation Commission's Orders No. 65190 and 73241 and the pooling arrangement established by Order No. 111345 until such time as these orders were considered and approved by the Secretary of the Interior or his authorized representative. This did not occur when Cotton submitted a proposed communization agreement on November 8, 1974, based on its ownership of the Sun lease as the record herein establishes that the five year primary term of said lease expired on October 14, 1974, and was not extended as provided in the lease by the production of oil and/or gas in paying quantities from the SW ¼ SW ¼ of Section 22 during the primary term, or the commencement of drilling prior to the end of the term and continued until production. Moreover, gas production from the well operated by Cotton in the NW ¼ of Section 22 coupled with the unitization of said section by the Oklahoma Corporation Commission did not extend the Sun lease as the approval of the Secretary or his representative, which was necessary under the pertinent regulations and the terms of the Sun lease in order to commit the SW ¼ SW ¼ of Section 22 to unit development and thereby continue the Sun lease in force, was not obtained prior to the expiration of said lease. Thus, approval of Cotton's proposed communization agreement was refused solely because the Sun lease had expired and Cotton was so advised. This refusal cannot be reasonably interpreted as an election by the Secretary not to be bound by the state spacing orders as Cotton maintains. However, the SW ¼ SW ¼ of Section 22 *did* become subject to the state unitization and pooling orders when said orders were submitted by Samedan for consideration as part of a proposed communization agreement based on the valid and existing Samedan lease and the communization agreement was approved by the Anadarko Area Director of the Bureau of Indian Affairs.

After examining the administrative record submitted in connection with 77–0415, the Court determines that substantial evidence exists therein to support the IBLA's

decision affirming the Area Director's approval of the Samedan communization agreement. Furthermore, the Court is not persuaded that the IBLA applied improper legal standards or incorrectly interpreted the applicable rules and regulations in reaching its decision. Therefore, the Court finds and concludes that the IBLA's decision should be affirmed.

In accordance with the Court's decision herein and the evidence before it, the Court determines that Samedan is entitled to share in the production from the unit well in Section 22 from the date of first production, January 11, 1975, and that Samedan is entitled to an accounting from Cotton and Defendant Oklahoma Natural Gas Company. Although the parties have stipulated that Samedan paid a total of $33,365.91 as production royalty from January, 1975, through April, 1978, for the benefit of its restricted Indian lessors and it appears that Samedan is entitled to judgment for this amount, the Court will withhold entry of final judgment herein in both cases until after a hearing has been had in connection with the requested accounting and Samedan's claim for interest has been determined.