**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 10 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SHIRLEY DELGADO, individually
and as Guardian for Erik Jason
Elizondo, a minor; JUAN PABLO
DELGADO, JR., a minor; ANTHONY
DARREN DELGADO, a minor;
SHIRLEY DELGADO, as Guardian
Ad Litem for Jase Lee Trevino, a
minor; JERRY SHAWN TREVINO;
JOSEPHINE KAY TREVINO
SALAZAR; JESSE SMITH
TREVINO, JR.; BRENNA
KETCHESHAWNO,

     Plaintiffs-Appellants,

v.

DEPARTMENT OF INTERIOR, Sued
as United States of America ex rel;
BUREAU OF INDIAN AFFAIRS, and
Office of Hearings and Appeals;
INTERIOR BOARD OF INDIAN
APPEALS; VINTAGE PETROLEUM,
INC., a Delaware Corporation,

    Defendants-Appellees.

No. 97-6125
(D.C. No. 95-CV-262)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

    [*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before **BALDOCK**, **McKAY**, and **KELLY**, Circuit Judges.

Plaintiffs-Appellants, to whom we collectively refer as Delgado,[1] are lessors of a restricted Indian oil and gas lease, and seek review of a decision of the Secretary of the Interior (Secretary) denying their request to cancel the lease. The district court affirmed the Secretary's decision. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

The Delgado lease was executed by Delgado's predecessor in interest, Luther Namaso, in favor of William Austin in 1980. The lease was located on land received by allotment from the federal government. The United States holds allotted land in trust for Indian owners, and has a fiduciary duty to ensure that the land is managed for "the sole use and benefit of the Indian allottees." Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 368 (1968) (internal quotation marks and citation omitted). Consequently the Secretary, acting through the Bureau of Indian Affairs (BIA), must approve the terms of Indian mineral leases before they can go into effect. See 25 U.S.C. § 396. The Secretary has delegated to the Bureau of Land Management (BLM) the responsibility for overseeing operation of Indian

---

[1] Ms. Delgado is guardian ad litem for all of the minor plaintiffs, four of whom are also her children. She is a niece of the original lessor, Luther Namaso, and the eight remaining plaintiffs are his grandnieces and grandnephews. Mr. Namaso devised his mineral interest to the grandnieces and grandnephews, and made Ms. Delgado his residual legatee. Although she is a residual legatee and guardian ad litem, for simplicity we refer to the lease as the Delgado lease.

leases and ensuring compliance with their terms. The Minerals Management Service (MMS) oversees the reporting of production, as well as calculation and payment of royalties for Indian oil and gas leases. See 25 C.F.R. §§ 212.4, 212.6 (1997). The BIA approved the Delgado lease. In 1985 the lessee, William Austin, began production of both oil and natural gas in paying quantities.

Problems were discovered dating from the start of production. Before drilling his first well, Austin had executed a communitization agreement which purported to commit Mr. Namaso's eighty acres to a 160-acre spacing unit. The agreement would have allowed the owners of the adjoining eighty acres, which had no producing wells, to participate equally in any royalty attributed to the communitized area. Although the agreement stated it would become effective only upon approval of the Secretary, Austin did not submit the agreement to the BIA until early 1988. In the meantime the agreement had been submitted to the Oklahoma Corporation Commission, which issued an order unitizing the ownership interests in the 160-acre spacing unit. Legal counsel for the designated operator of the wells then prepared a Division Order Title Opinion, dated November 5, 1985, indicating Mr. Namaso's tract was communitized and any royalty should be shared equally with the owners of the other eighty acres. Austin relied on this division order and paid the royalty accordingly. In 1988 Austin assigned the lease to Vintage Petroleum, Inc., the current lessee and operator.

Vintage continued Austin's royalty division practice when it took over the lease. In March, 1988, the BIA rejected the proposed communitization because it was not in Mr. Namaso's best interest. Vintage proposed a second communitization agreement, which the BIA rejected in September, 1988. One month later Vintage reported the underpayment problem to the BIA, and began paying Mr. Namaso the full twenty-percent royalty as well as repaying his overdue royalties. The BIA began investigating the underpayments to determine how much Austin and Vintage owed. The Area BIA Director referred the matter to the MMS for audit.

During a well inspection in September, 1989, the BLM discovered bypass piping on both wells which if connected would allow gas to bypass the meters. The BLM told Vintage this was a major violation, issued a verbal incident of noncompliance (INC), and instructed Vintage to immediately remove the bypass pipes. Three days later the BLM issued a written INC and made another inspection, which revealed the bypass pipes had already been removed.

Several months before his death in 1990, Mr. Namaso informed the BIA that his own investigation showed he had been underpaid in excess of $575,000 in royalties; based on this and the meter bypass violation, he requested an audit, collection of underpayments, and cancellation of the lease. The letter was transmitted to the MMS for use in its on-going audit. That audit ultimately found royalty violations in three areas, and resulted in the recovery from Austin and

Vintage of $1,023,502.27 in underpaid royalties and interest penalties.

The first royalty violation involved improper volume allocation, referring to the invalid communitization agreement and consequent underpayment of royalties by one half. The MMS issued separate demand letters to Austin and Vintage for the amount of the underpayments. After receiving full payment from both companies, the MMS assessed interest penalties against both Austin and Vintage, who paid the penalties in full.

The second area of royalty violations arose from a failure to perform dual accounting. MMS regulations provide that when hydrocarbons are sold to an affiliate of the seller, valuation must be calculated under two different methods, and royalties paid based on the higher valuation. The MMS determined that both Austin and Vintage underpaid royalties because of their failure to perform dual accounting. Austin and Vintage paid the amounts MMS assessed them for this violation, with interest.

The third royalty violation was based on problems in the reporting of condensate sales. Although Austin appeared to have been systematically underpaying royalties based on these sales, Vintage had discovered its problems in this area and adjusted its system for separating and marketing condensate before the MMS audit. Both Austin and Vintage repaid royalties for condensate to MMS's satisfaction.

In response to Mr. Namaso's cancellation request, the BIA requested reports from BLM and MMS as to whether the violations of the lease and regulations warranted cancellation. The MMS responded with a memorandum concluding that the past royalty violations did not merit cancellation because "it was not an uncommon practice for payors to calculate and pay royalties based on a proposed communitization agreement, pending approval by the Bureau of Indian Affairs and Bureau of Land Management. In most instances," the memorandum continued, "proposed communitization agreements were approved and royalty payments based on the proposed agreement would represent the most accurate royalty basis." I Aplt. App. at 297 (doc. FF). Two further considerations made Vintage and Austin less culpable, according to the MMS. First, Vintage and Austin were relying on a Division Order Title Opinion, on which other unrelated royalty payors also relied, and which in turn was based upon an Oklahoma state order unitizing the 160 acres and mandating a fifty percent lease allocation. Second, "it is not uncommon for MMS and royalty payors to have different interpretations on 'dual accounting' valuation requirements. The MMS audits often result in additional royalty payments when 'dual accounting' analyses are performed." Id. at 298. The MMS found no evidence of fraudulent accounting practices or criminal wrongdoing, and consequently recommended the lease not be canceled.

The MMS also conducted a valuation known as a "major portion analysis" to determine whether Delgado was receiving royalties below the fair market value, and, if so, whether cancellation of the Delgado lease was appropriate. The analysis concluded:

> Based on all indications of market value that we can locate, we conclude that Indian royalty lessors for the Delgado lease are receiving compensation for gas production that equals or exceeds the fair market value of other gas production in the same area. Our analyses can identify no pricing discrepancies that would warrant lease cancellation.
> Based on our review and knowledge of the Indian leasing regulations, lease cancellation may actually cause the Indian lessors financial harm. . . . Any new operator, or the Indian mineral owners, should they desire to take over operation of the lease, must negotiate a gas sales contract and would probably receive a price much closer to the spot-market price than the price currently being paid to the Indian lessors.

II Aplt. App. at 451.

The BLM recommended, based on its oversight of the lease operations, that the lease not be canceled. It reported that it had inspected the lease nine times between 1986 and 1992, and had issued only one INC. It concluded the bypass piping did not warrant cancellation because, among other things, (1) it was promptly removed, even before the written INC was issued; (2) "[i]t appeared the bypass was being used only to allow the operator to calibrate the meters without shutting in the wells;" and (3) comparison of the volume of gas reported to the MMS and the volume reported to the Oklahoma Tax Commission showed variations "not in excess of normal," indicating "that gas was not regularly

bypassing the meter." Id. at 320. Delgado points out that this comparison was done after the bypass pipe was removed, so it indicates nothing about how much gas may have bypassed the meter during the time the piping was installed. MMS described in some detail an operator's arguably legitimate reasons for using bypass piping, including the damage that could result from shutting in a well. It added that operations on the Delgado lease were generally clean, and that the lease had recently been used for training BIA personnel in proper lease operation. See id.

With the major portion analysis and reports from the BLM and MMS, the cancellation request was ripe for decision. The Area BIA Director allowed the parties to present evidence and brief the issues (a grant of process not required under its regulations) and issued its final opinion in February, 1994. It held cancellation was not mandated by the relevant regulations, and concluded cancellation would not be in Delgado's best interest. Delgado appealed to the Interior Board of Indian Appeals (IBIA), and after further briefing the IBIA affirmed the lower decision in a thorough written opinion. See VII Aplt. App. at 1876-94.

Delgado argues the Secretary's decision not to cancel the lease (1) violated her constitutional property and contractual rights (2) was ultra vires and erroneous, and (3) was arbitrary and capricious.

In reviewing the Secretary's action we accord no particular deference to the district court. See Mount Emmons Mining Co. v. Babbitt, 117 F.3d 1167, 1170 (10th Cir. 1997). We stand in the same posture with respect to the agency as did the district court, applying the APA's standards governing judicial review directly to the Secretary's decision. See Valley Camp of Utah, Inc. v. Babbitt, 24 F.3d 1263, 1267 (10th Cir. 1994). Those standards, in relevant part, allow us to "set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (B) contrary to constitutional right, power, privilege, or immunity . . . ." 5 U.S.C. § 706(2).

Delgado rests her constitutional argument on the due process clause of the Fifth Amendment, but nowhere in her brief mentions the elements of a procedural due process claim. Those elements are: (1) the existence of a recognized liberty or property interest, and (2) failure to receive the process that is due. See Mathews v. Eldridge, 424 U.S. 319, 332–35 (1976). Instead of arguing that the process she received was constitutionally lacking, Delgado argues the Secretary's action was, on its merits, unreasonable. In addition to this failure to state a due process argument, Delgado failed adequately to raise the issue before the Secretary. Moreover, she has no property interest in canceling the lease, and in any case received superabundant process from the Secretary. The

constitutional argument is meritless and fails to trigger a more searching standard of review than we would otherwise employ.  See Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1533 (11th Cir. 1991) (holding mere allegation of due process violation by agency is insufficient to raise a constitutional claim).

Although Delgado repeatedly asserts the Secretary's decision was ultra vires, that term does not provide a basis for us to set aside agency action.  We will construe the argument as one that the agency determination was "otherwise not in accordance with law."  5 U.S.C. § 706(2).

Delgado's primary argument is that the Secretary was without authority for its action because it failed to follow its own regulation.  She further argues that the applicable regulation is unambiguous and the court should give effect to its plain meaning.  The regulation provided as follows:

> A lease will be canceled by the Secretary of the Interior for good cause upon application of the lessor or lessee, or if at any time the Secretary is satisfied that the provisions of the lease or of any regulations heretofor or hereafter prescribed have been violated.

25 C.F.R. § 212.23(a) (1994).

Delgado's position is that the Secretary is required under this regulation to cancel a lease whenever it finds any violation has occurred.  Delgado points to the plain language of the regulation, particularly to the words, "A lease will be canceled by the Secretary . . . if at any time the Secretary is satisfied that the provisions of the lease or of any regulations . . . have been violated," id.

(emphasis added), and attempts to apply a <u>Chevron</u> analysis to our review. <u>See</u>

<u>Chevron U.S.A. Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984).

Delgado argues that under the first prong of <u>Chevron</u> the court should hold the

regulation is unambiguous and should give effect to its plain meaning. <u>Chevron</u>,

alas, is inapplicable. <u>Chevron</u> applies when a regulation is challenged on the

ground that it is inconsistent with a governing statute. Delgado does not

challenge § 212.23(a); on the contrary, she stakes her case on it. When

interpreting its own regulation, an agency is entitled to exercise even broader

discretion than it may under the second prong of <u>Chevron</u>. <u>See Valley Camp</u>, 24

F.3d at 1267. The Secretary's interpretation of § 212.23(a) is "controlling unless

plainly erroneous or inconsistent with the regulation." <u>Auer v. Robbins</u>, 117 S.

Ct. 905, 911 (1997) (internal quotation marks and citation omitted); <u>see Udall v.</u>

<u>Tallman</u>, 380 U.S. 1, 16-17 (1965).

> The Secretary determined that under § 212.23(a), the
>
> BIA is not required to cancel a lease whenever the lease terms or
> regulations are violated. Instead, it retains discretion to review the
> circumstances surrounding a violation(s) and determine whether
> cancellation is warranted, taking into consideration, <u>inter alia</u>, the trust
> responsibility to act in the best interest of the Indian landowner(s).

VII Aplt. App. at 1885-86.[2]

---

[2] Certain language in the IBIA decision suggests a more rigid, nondiscretionary rule: "when a violation of a lease of Indian oil and/or gas properties has been cured and not repeated, the violation may not serve as the basis for lease cancellation." VII Aplt. App. at 1894. Although we, along with

- 11 -

The Secretary's interpretation is permissible for several reasons.  In Poafpybitty the Supreme Court rejected the interpretation Delgado attempts to impose on § 212.23(a).  Construing language identical to that before us, the Court wrote, "The regulations do empower the Secretary to cancel a lease . . . . However, there is no justification for concluding that the severe sanction of cancellation of the lease is the only relief for all breaches of the lease terms or for any failure to pay royalties."  Poafpybitty, 390 U.S. at 374 (citation omitted).  Although this could end the matter, other reasons lend support to the Secretary's interpretation.  Disallowing the Secretary discretion in canceling leases would entail nearly absurd results.  Under Delgado's interpretation, the slightest violation—even a de minimis underpayment of royalties—would require cancellation.  Furthermore, Delgado's interpretation would force the Secretary into conflict with his fiduciary duty to act at all times in the best interest of the Indian lessor.  As the Supreme Court noted in Poafpybitty, "Both the lessor and the lessee may wish to resolve their disagreement by the payment of damages and not by the cancellation of a basically satisfactory lease."  Poafpybitty, 390 U.S. at 374.  Yet a strict rule of cancellation for every violation would deny the lessor

the district court, can foresee situations in which applying such a bright-line rule might be an abuse of discretion, we can affirm the Secretary's interpretation because it is evident that in this case he did weigh the circumstances and apply his discretion.

this option.  Even worse, assuming the violation was a de minimis underpayment, the Secretary would be forced to cancel the lease even if in the circumstances cancellation would deprive the lessor of tens or possibly hundreds of thousands of dollars in royalties.  Considering the "substantial deference" we owe to the Secretary, we cannot require him to engage in such absurdity, nor will we set aside an interpretation that reasonably harmonizes his duties.  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).

Delgado argues the Secretary's interpretation is inconsistent with the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701–57 (FOGRMA), which provides the Secretary "should aggressively carry out his trust responsibility in the administration of Indian oil and gas."  Id. § 1701(a)(4). FOGRMA also states a purpose of cracking down on the nonpayment of Indian oil and gas royalties.  See id. § 1701(b)(3).  To carry out these purposes, FOGRMA expands the remedies at the Secretary's disposal by providing monetary penalties for late payment or nonpayment of royalties and other violations.  FOGRMA is careful not to alter the Secretary's preexisting authority to cancel leases.  The statute nowhere mentions cancellation or the circumstances in which it should be used.  See id. § 1753(a) ("The penalties and authorities provided in this chapter are supplemental to, and not in derogation of, any penalties or authorities contained in any other provision of law.").  The fact that FOGRMA gives the

Secretary additional remedies for Indian lease violations indicates quite strongly that cancellation cannot be the only appropriate remedy. Instead of supporting Delgado's argument, FOGRMA undercuts it. Delgado's view of mandatory cancellation for lease violations would render FOGRMA's extensive scheme of more flexible remedies void.[3]

Delgado also argues that the Secretary's decision was arbitrary and capricious. Our review under this standard is narrow, and we may not substitute our judgment for that of the agency. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983). "'[T]he agency need only demonstrate that it considered relevant factors and alternatives after a full ventilation of issues and that the choice it made was reasonable based on that consideration.'" Lodge Tower Condo. Ass'n v. Lodge Properties, Inc., 85 F.3d 476, 477 (10th Cir. 1996) (quoting Mount Evans Co. v. Madigan, 14 F.3d 1444, 1453 (10th Cir. 1994)).

Delgado takes issue with the agency's factual finding that the bypass pipe was in place on the wells for only a short time. She claims this finding was

---

[3]FOGRMA's legislative history confirms our analysis. That history indicates Congress viewed cancellation as a "severe penalty" which "may" be used if "failures to pay royalties are flagrant and persistent." H.R. Rep. No. 97-859, at 18 (1982), reprinted in 1982 U.S.C.C.A.N. 4268, 4272. Congress concluded "that the Secretary needed authority to impose more appropriate and flexible penalties against lessees . . . ." Id. at 18-19.

clearly erroneous, and the IBIA's decision was arbitrary and capricious because it failed to consider evidence she presented. The IBIA decision indicates the agency properly weighed the evidence, including what Delgado presented, and arrived at a conclusion well supported by evidence. See VII Aplt. App. at 1888. We cannot say its finding was clear error.

Delgado also claims the Secretary was bound to cancel the lease under the lease's own terms, and it was arbitrary and capricious for him to fail to do so. However the lease is written in even more discretionary language than the regulation. The lease provides that "[w]hen, in the opinion of the Secretary" there has been a violation of any of the terms of the lease, the Secretary "shall have the right at any time after 30 days notice to the lessee, specifying the terms and conditions violated, and after hearing . . . to declare this lease null and void . . . ." VII Aplt. App. at 1849 (emphasis added). This provision gives the Secretary the power to cancel; it does not require him to do so. We conclude the Secretary adequately considered all relevant facts and articulated a rational connection between those facts and its decision. Delgado's remaining

contentions are without merit.

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge